**UNITED PARCEL SERVICE, INC., Petitioner,**

v.

**Pennsylvania PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 6, 2001.

Decided Dec. 5, 2001.

---

**6.** Act of July 31, 1968, P.L. 769, *as amended,*   45 P.S. §§ 1102–1602.

Carl A. Solano and Willaim M. Barnes, Philadelphia, for petitioner.

Elizabeth A. Lion Januzzi, Harrisburg, for respondent.

Before PELLEGRINI, Judge, KELLEY, Judge, and RODGERS, Senior Judge.

PELLEGRINI, Judge.

United Parcel Service, Inc. (UPS) appeals from an order of the Pennsylvania Public Utility Commission (PUC) adopting in part and rejecting in part the decision of the Administrative Law Judge (ALJ) regarding the general assessments for its fiscal years 1997–1998, 1998–1999 and 1999–2000.

Pursuant to Section 510(a) of the Public Utility Code (Code), 66 Pa.C.S. § 510(a), all public utilities in Pennsylvania, including UPS, are required to pay assessments levied by the PUC to cover the PUC's estimated costs of administering the Code. The PUC's assessment methodology is a two-step process. First, the PUC must determine the total amount to be assessed against all utilities. This figure is its approved and estimated operating budget for the upcoming fiscal year, net of estimated fees collected for services rendered by the PUC during the fiscal year, and net of any balance carried over into the fiscal year from the preceding year.[1] Next, the PUC must allocate that cost among "groups" of utilities and is to do so as follows:

**(b) Allocation of assessment.** On or before March 31 of each year, every public utility shall file with the commission a statement under oath showing its gross intrastate operating revenues for the preceding calendar year. If any public utility shall fail to file such statement on or before March 31, the commission shall estimate such revenues, which estimate shall be binding upon the public utility for the purposes of this section. For each fiscal year, the allocation shall be made as follows:

(1) The commission shall determine for the preceding calendar year the amount of its expenditures directly attributable to the regulation of *each group of utilities furnishing the same kind of service*, and debit the amount so determined to *such group*. The commission may, for purposes of the assessment, deem utilities rendering water, sewer or water and sewer service, as defined in the definition of "public utility" in section 102 (relating to definitions), as a utility group.

1. 66 Pa.C.S. § 510(a) provides in relevant part:

Before November 1, of each year, the commission shall estimate its total expenditures in the administration of this part for the fiscal year beginning July of the following year.... The commission shall subtract from the final estimate: (1) The estimated fees to be collected.... (2) The estimated balance of the appropriation ... to be carried over into such fiscal year from the preceding one. The remainder so determined, herein called the total assessment, shall be allocated to, and paid by, such public utilities in the manner prescribed.

(2) The commission shall also determine for the preceding calendar year the balance of its expenditures, not debited as aforesaid, and allocate such balance to *each group* in the proportion which the gross intrastate operating revenues of *such groups* for that year bear to the gross intrastate operating revenues of all groups for that year.

(3) The commission shall then allocate the total assessment prescribed by subsection (a) to *each group* in the proportion which the sum of the debits made to it bears to the sum of the debits made to all groups.

(4) Each public utility within *a group* shall then be assessed for and shall pay to the commission such proportion of the amount allocated to *its group* as the gross intrastate operating revenues of the public utility for the preceding calendar year bear to the total gross intrastate operating revenues of *its group* for that year.

(5) The assessment provided for in this section shall not be made against utilities governed by the provisions of Chapter 24 (relating to taxicabs in first class cities).

Sections 510(b)(1)-(5) of the Code, 66 Pa. C.S. § 510(b)(1)-(5). (Emphasis added.) Common Carriers of Property are one group of utilities [2] that the PUC further subdivided into four sub-groups for the purpose of allocating its expenses which is the subject of this proceeding.

UPS is engaged in the business of transporting property within the Commonwealth and across state lines and is classified as a "Common Carrier of Property." [3] As a "Common Carrier of Property," UPS is a public utility and operates within Pennsylvania under the authority of the PUC.[4] UPS filed objections to its general

---

**2.** Section 102 of the Code, 66 Pa.C.S. § 102, provides the definition of "public utility" and includes the following groups:

(1) Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for:

(i) Producing, generating, transmitting, distributing or furnishing natural or artificial gas, electricity, or steam for the production of light, heat, or power to or for the public for compensation;

(ii) Diverting, developing, pumping, impounding, distributing, or furnishing water to or for the public for compensation.

(iii) *Transporting passengers or property as a common carrier.*

(iv) Use as a canal, turnpike, tunnel, bridge, wharf, and the like for the public for compensation.

(v) Transporting or conveying natural or artificial gas, crude oil, gasoline, or petroleum products, materials for refrigeration, or oxygen or nitrogen, or other fluid substance, by pipeline or conduit, for the public for compensation.

(vi) Conveying or transmitting messages or communications ... by telephone or telegraph or domestic public land mobile radio service including, but not limited to, point-to-point microwave radio service for the public for compensation.

(vii) Sewage collection, treatment, or disposal for the public for compensation. (Emphasis added.)

**3.** Section 102 of the Code defines "motor carrier" as a "common carrier by motor vehicle" and defines "common carrier" as:

Any and all persons or corporations holding out, offering, or undertaking, directly or indirectly, service for compensation to the public for the transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by, through, over, above, or under land, water, or air, and shall include forwarders, but shall not include contract carriers by motor vehicles, or brokers, or any bona fide cooperative association transporting property exclusively for the members of such association on a nonprofit basis.

**4.** Section 102 of the Code defines "Public utility" as:

(1) Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for:

assessments by the PUC of $357,287 for fiscal year 1997–1998, $440,366 for fiscal year 1998–1999,[5] and $337,152 for fiscal year 1999–2000,[6] arguing that the assessments should have been approximately 54% lower than that ordered by the PUC because the method by which the PUC allocated its assessments among the utilities was contrary to that required by the Code.[7] It argues that Sections 510(b)(1) and (2) of the Code requires that the PUC's indirect expenses be allocated among each "group" of utilities furnishing the same kind of service, e.g., electric, gas, telephone, common carriers. Instead, it avers that the PUC impermissibly subdivided the group "Common Carriers" into four subgroups resulting in a higher indirect expense allocation to UPS and lower assessments to other utility groups such as electric, gas and telephone utilities. UPS explained:

> Rather than multiply total indirect expenses times the gross intrastate revenue percentage, the Commission divides the total indirect expenses into four categories and does separate allocations for each category. The first category is what the Commission calls the "Motor Carrier Group," which includes all Motor Carriers of Property and Motor Common Carriers. The second category is the "Transportation Group," consisting, again, of Motor Carriers of Property and Motor Common Carriers but also including Railroads, Boats and Ferries, and Aircraft. The third catego-

ry is the "Fixed Utility Group," and consists of all utility groups that are not within the "Transportation Group." Finally, there is a category of indirect expenses that includes all of the utility groups.

UPS also argued that the PUC's Fiscal Office's revised assessment for fiscal year 1998–1999 was not sufficient and it was entitled to a further reduction of $13,910.63. To the contrary, the PUC's Fiscal Office argued that the Code was sufficiently ambiguous to give the PUC deference in interpreting Section 510(b) and allowed it to use multiple indirect expense categories and that UPS was not entitled to any further reductions. The matter was assigned to an ALJ for hearings.

As to the indirect expenses, the ALJ agreed with UPS that Section 510(b) of the Code was not ambiguous. It determined that the Code referred to one balance of expenditures, and when referring to "each group" in subsection (b)(2), it was referring to "each group of utilities furnishing the same kind of service" as provided for in subsection (b)(1). The balance of the PUC's expenditures were to be allocated on the basis of one separate proportion for each utility group to which direct expenses were allocated under Section 510(b)(1) of the Code. The ALJ recommended that the PUC's Fiscal Office be required to recalculate UPS' assessment.[8]

The PUC, however, rejected the recommendation of the ALJ concluding that the

---

             \* \* \*

    (iii) Transporting passengers or property as a common carrier.

**5.** This figure was revised by the PUC to $343,715 after it determined it had made an error in its calculation.

**6.** The PUC's budgets that had to be allocated among the utilities for the three years at issue were $37,942,000 for fiscal year 1997–1998;

$38,728,658 for fiscal year 1998–1999; and $39,646,973 for fiscal year 1999–2000.

**7.** UPS alleged that it should have been assessed $165,804 in fiscal year 1997–1998; $147,926 in fiscal year 1998–1999; and $160,741 in fiscal year 1999–2000.

**8.** We note that both parties filed exceptions/objections to the ALJ's recommended decision.

use of subgroups of utility groups for determining the proper allocation of indirect costs was consistent with the language in the statute. It did not agree with the ALJ that the reference to "each group" in subsection (b)(2) referred back to "each group of utilities furnishing the same kind of service" stated in subsection (b)(1), specifically noting that if that was the intended meaning, the statute would have referenced "such" group.[9] UPS then filed a petition for review with this Court.

■ Initially, the PUC argues in its motion to quash that we lack jurisdiction because UPS filed a petition for review pursuant to our appellate jurisdiction under 42 Pa.C.S. § 763 relating to direct appeals from government agencies, while Section 510(d) of the Code, 66 Pa.C.S. § 510(d), specifically provides that the proper course of action to appeal an assessment is to file an "action at law." Section 510(d) provides in relevant part:

Any public utility making any such payment may, at any time within two years from the date of payment, sue the Commonwealth *in an action at law* to recover the amount paid, or any part thereof, upon the ground that the assessment was excessive, erroneous, unlawful, or invalid, in whole or in part, provided objections, as herein before provided, were filed with the commission, and payment of the assessment was made under protest either as to all or part there-

of. . . . *In any action for recovery of any payments made under this section, the claimant shall be entitled to raise every relevant issue of law, but the findings of fact made by the commission, pursuant to this section, shall be prima facie evidence of the facts therein stated.* (Emphasis and italics added.)

It further points out that Section 510(e) of the Code, 66 Pa.C.S. § 510(e), provides that the action at law is the exclusive remedy:

The provisions of this part relating to the judicial review of orders and determinations of the commission shall not be applicable to any findings, determinations, or assessments made under this section. The procedure in this section providing for the determination of the lawfulness of assessments and the recovery back of payments made pursuant to such assessment *shall be exclusive of all other remedies and procedures.* (Emphasis added.)

The PUC, however, does not disagree with UPS that we could treat the petition for review as a complaint and allow UPS to proceed in our original jurisdiction[10] which we will do and treat as if properly filed under our original jurisdiction pursuant to Section 761 of the Judicial Code, 42 Pa. C.S. § 761, and decide the legal question as to what "groups" mean under Sections 510(b)(1) and (2) of the Code.[11]

Turning then to the merits of UPS' action, it contends that the PUC erred in its

---

9. Regarding the 1998–1999 assessment, the ALJ agreed with the Fiscal Office that UPS failed to show that the calculations were not *prima facie* correct and that the error was only the result of shortchanging the motor carriers. The PUC adopted the ALJ's recommendation on that issue.

10. *See Martin v. Jeffes*, 93 Pa.Cmwlth. 82, 501 A.2d. 308 (1985) and *Robson v. Biester*, 53 Pa.Cmwlth. 587, 420 A.2d 9 (1980) (petitions for review addressed to court's appellate jur-

isdiction treated as petitions for review addressed to court's original jurisdiction pursuant to 42 Pa.C.S. § 761).

11. Because the parties have asked us to decide the legal issue, and in the interests of judicial economy, we will treat this as if the PUC and UPS have filed a cross-motion for summary relief pursuant to Pa. R.A.P. 1532(b), which provides that an application for summary relief may be filed at any time after the filing of a petition for review in an

interpretation of Section 510(b) of the Code when calculating the allocation of its indirect expenses by dividing the total indirect expenses for the Common Carrier of Property group into four subcategories. UPS argues that the plain language of Section 510(b) mandates a single category of indirect expenses allocated to Common Carriers of Property because Section 510(b)(1) refers to *each group of utilities furnishing the same kind of service,* and it stands to reason that in the subsequent subsection where "each group" is referenced, it also means "each group of utilities furnishing the same kind of service." [12] UPS further argues that even if the phrase "each group of utilities furnishing the same kind of service" as used in subsection (1) has a different meaning from the phrase "each group" used in subsection (2), that difference would not allow the PUC to make four separate allocations of indirect expenses to the Motor Carrier Group, the Transportation Group, the Fixed Utility Group and a group consisting

of all utilities because subsection (2) provides for just one "balance" of expenditures to be allocated among the groups.

The PUC, however, argues that the statutory language is vague because subsection (1) refers to "utilities furnishing the same kind of service" but subsection (2) only refers to "each group" and does not delineate the specific group to which indirect expenses are to be allocated. It, therefore, concludes that its use of multiple subcategories of indirect expenses is a permissible agency interpretation of the statute and consistent with the intent of Section 510 of the Code, which is to allocate expenses to specific groups whenever possible. Moreover, the PUC states the reason for using the four categories of indirect expenses is to more accurately allocate the PUC's regulatory costs to those groups that cause those costs to be incurred, and it has consistently utilized the same methodology for over 20 years when allocating its costs to motor carriers of property.

appellate or original jurisdiction matter. Summary judgment may be granted only in those cases where the record clearly shows that there exists no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Marks v. Tasman,* 527 Pa. 132, 589 A.2d 205 (1991). On a *motion* for summary judgment, the record must be viewed in a light most favorable to the opposing party, and all doubts as to the existence of a genuine issue of material fact must be resolved in favor of the non-moving party. *Kapres v. Heller,* 536 Pa. 551, 640 A.2d 888 (1994). A motion for summary judgment requires a determination of whether there exists a genuine issue of material fact and whether that moving party is entitled to judgement as a matter of law. *Judges of the Court of Common Pleas of the Twenty–Seventh Judicial District v. County of Washington,* 120 Pa.Cmwlth. 283, 548 A.2d 1306 (1988).

**12.** Because Section 510(d) of the Code provides that any aggrieved utility can file an action of law in our original jurisdiction, 42 Pa.C.S. § 761, to challenge the assessment if

any factual disputes were involved, we would not be bound by the agency's findings if, after hearing, we accepted substantial credible evidence by the utility that the allocation was incorrect. However, because Section 510(d) of the Code provides that the agency's findings shall constitute prima facie evidence of the facts, that shifts the burden to the utility to disprove the findings and failing to do so, the PUC's findings concerning the facts prevails. A somewhat similar shifting of the burden occurs in tax assessment appeals where the assessment constitutes prima facie evidence of the validity of the assessment and the burden shifts to the property owner to prove that the assessment is incorrect. *See Appeal of Township of Ross,* 88 Pa.Cmwlth. 618, 491 A.2d 929 (1985). Moreover, because this case involves an action at law in our original jurisdiction and the PUC is a litigant, we will not give that agency deference in its interpretation of what "group" means even if we somehow determine that term to be ambiguous. *See Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).

However, the PUC's argument is disingenuous and it conjures up an ambiguity where none exists in order to achieve an outcome it desires.[13] Section 510(b)(1) is clear that the PUC shall determine the amount of its expenditures directly attributable to the regulation of *each group of utilities furnishing the same kind of service* and debit the amount determined to *such group*. In the paragraph immediately following, Section 510(b)(2) provides that the PUC shall also determine the balance of its expenditures and allocate that balance to *each group*. This can only mean that the PUC must allocate its balance to *each group of utilities furnishing the same kind of service* because no other types of groups are mentioned, and there is no support or rationalization for the PUC's allegation that subsection (b)(2) means it can allocate balances to subcategories of the individual group of utilities furnishing the same kind of service. Had the General Assembly intended that the PUC allocate its budget in such a fashion, it would have stated as much. Additionally, that "group" means "group" and not "subgroup" is evident, considering that Section 510 of the Code sets forth a sequential scheme to determine the allocation of assessments, and for the PUC to interpret that "group" is defined differently in subsection (b)(2) from all of the other subsections is incongruous.

Because the PUC misinterpreted Section 510(b) of the Code and, therefore, miscalculated UPS' assessments as well as those of all other utilities furnishing the same kind of service, the case is remanded to the PUC for a recalculation of UPS' assessments. The calculations are to be based on the PUC's balance of expenditures only utilizing the group of Common Carriers once and not dividing its total indirect expenses into four subcategories.[14]

Accordingly, the PUC's motion to quash is dismissed. Judgment is entered in favor of UPS, and the case is remanded for recalculation of UPS' assessments for fiscal years 1997–1998, 1998–1999 and 1999–2000.

This decision was reached prior to the death of Senior Judge Rodgers.

### ***ORDER***

AND NOW, this 5th day of December, 2001, the Pennsylvania Public Utility Commission's motion to quash is dismissed. Judgement is entered in favor of United Parcel Service, Inc., and the case is remanded to the PUC for recalculation of assessments made to United Parcel Service, Inc. for its fiscal years 1997–1998, 1998–1999 and 1999–2000 in accordance with this decision.

Jurisdiction relinquished.

13. Where the language of a statute is clear, words and phrases contained in that statute must be construed in accordance with their common and accepted usage. 1 Pa.C.S. § 1903; *MacElree v. Chester County,* 667 A.2d 1188 (Pa.Cmwlth.1995), *petition for allowance of appeal denied,* 545 Pa. 666, 681 A.2d 180 (1996). However, where the statute is ambiguous, a court must determine the intent of the General Assembly in accordance with 1 Pa. C.S. § 1921.

14. UPS also contends that the PUC was required to reduce its assessments because they were unreasonably high, and that its assessments for fiscal year 1998–1999 were unreasonable because the PUC made mathematical errors in its calculation of the assessment refund. Because we have determined that the PUC erred in its calculations of all of the assessments by improperly dividing its indirect expenses into subcategories and allocating them among four overlapping subgroups of utilities furnishing the same kind of service, we need not address these issues.