965 A.2d 226

Ronald BLOUNT, individually and as President of the Taxi Workers' Alliance of Pennsylvania, ARINK, Inc., RAINK, Inc., Audrey Cab, Inc., t/a County Cab, SAWINK, Inc., Dee–Dee Cab, Inc., t/a Penn–Del Cab, Quaker City Cab, Inc., Germantown Cab Co., and Michael Etemad, Appellants

v.

PHILADELPHIA PARKING AUTHORITY, Appellee.

Supreme Court of Pennsylvania.

Argued Oct. 20, 2008.

Decided Feb. 20, 2009.

Michael Sheridan Henry, Drew Salaman, Philadelphia, for Ronald Blount, et al., appellants.

Dino Antonio Ross, WolfBlock, LLP, Harrisburg; Dennis Gerard Weldon, Jr., Philadelphia; Brian P. Flaherty, Andrew A. Chirls, WolfBlock, LLP, Philadelphia; Alan C. Kohler, WolfBlock, LLP, Harrisburg, for Philadelphia Parking Authority, appellee.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

### OPINION

Justice GREENSPAN.

This appeal concerns a determination of whether the Commonwealth Court has original jurisdiction over a challenge brought by taxicab drivers and companies [1] against the Philadelphia Parking Authority (PPA). In an *en banc* opinion, the Commonwealth Court broadly held that the PPA is a local rather than a Commonwealth agency for the purposes of jurisdiction and, therefore, it lacked original jurisdiction to hear a challenge to the PPA's regulations. *Blount v. Phila. Parking Auth.*, 920 A.2d 215, 217 (Pa.Commw.2007). The Commonwealth Court transferred the case to the Philadelphia County Court of Common Pleas. *Id.* For the following reasons, we reverse and remand the case to the Commonwealth Court for resolution on the merits.

### Background

In 1947, the General Assembly empowered certain political subdivisions to create parking authorities.[2] In 1950, the City of Philadelphia established its parking authority, the PPA, to

---

**1.** Ronald Blount, individually and as president of the Taxi Workers' Alliance, Michael Etemad, a local business owner, and several corporations providing taxi and radio dispatch services (ARINK, Inc., RAINK, Inc., Audrey Cab, Inc., t/a County Cab, SAWINK, Inc., Dee–Dee Cab, Inc., t/a Penn–Del Cab, Quaker City Cab, Inc., Germantown Cab Co.) are Appellants herein.

**2.** Act of June 5, 1947, P.L. 458 (53 P.S. §§ 341–356). The 1947 Parking Authorities Law was superseded and re-codified in 2001.

manage off-street parking. 53 P.S. § 344. The PPA also assumed responsibility for on-street parking in 1983. At that time, and until 2001, parking authorities throughout the Commonwealth had similar organizational structures, powers, and duties, as outlined in the original Parking Authorities Law. 53 P.S. §§ 344–356. The law drew no distinctions between parking authorities in cities of the first class (Philadelphia) and those in other municipalities. 53 P.S. §§ 341–356. For example, each parking authority throughout the state was managed by its own Governing Board whose five members were appointed by the local mayor. 53 P.S. § 348. Parking authorities regulated only on and off-street parking. 53 P.S. § 345. They maintained independent budgets and issued bonds to raise capital. 53 P.S. § 345.

In 2001, the General Assembly re-codified and significantly amended the Parking Authorities Law.[3] The new law established different powers and organizational standards for the PPA as compared to parking authorities of other municipalities.[4] For example, the PPA has a six-member Governing Board appointed by the Governor of Pennsylvania. 53 Pa.C.S. § 5508.1(c). In addition, the PPA assumed control of taxicab and limousine operations in and around Philadelphia. 53 Pa.C.S. § 5505(d)(23), (24). Previously, regulation of taxicabs and limousines in Philadelphia was a function of the Public Utilities Commission (PUC). Under the amendment, these services are now regulated by the PPA, whose power extends to persons or corporations providing these services between points in Philadelphia, from any point in Philadelphia to any point in the Commonwealth or outside, and from any point in the Commonwealth to any point in Philadelphia. 53 Pa.C.S. § 5714(c). The General Assembly supervises and controls in part the distribution of funds from the PPA's budget. 53 Pa.C.S. § 5707. Although the PPA underwent fundamental changes with the 2001 amendments, the parking authorities in

3. Act of June 19, 2001, P.L. 22 (53 Pa.C.S. §§ 5501–5517, 5701–5745).

4. 53 Pa.C.S. §§ 5505(d). The 2001 Parking Authorities Law refers to parking authorities of "cities of the first class." Philadelphia is the only city of the first class in the Commonwealth. *See Philadelphia Ent. & Dev. v. City of Philadelphia*, 595 Pa. 538, 939 A.2d 290, 292 (2007).

other municipalities retained the same pre-amendment administrative structures and powers.

On June 27, 2005, pursuant to the 2001 Parking Authorities Law, the Governing Board of the PPA approved the Taxicab and Limousine Regulations (Regulations). Subsequently, the PPA issued citations to various taxi drivers and companies based on alleged violations of the Regulations. Appellants sought to challenge the Regulations and, in April 2006, they sued the PPA in the Commonwealth Court. Appellants alleged that the PPA improperly adopted and enforced its Regulations, thereby harming them. Appellants claimed that, as a Commonwealth agency, the PPA should have followed the procedure outlined in the Commonwealth Documents Law [5] when it adopted the Regulations. Appellants sought declaratory and injunctive relief, as well as writs of mandamus and prohibition in a Petition for Review.

In June 2006, the PPA filed preliminary objections to Appellants' Petition for Review. Soon thereafter, Appellants requested a preliminary injunction to stop the enforcement of the Regulations. After a hearing, the Commonwealth Court denied the preliminary injunction, holding that Appellants had not satisfied the requirements for injunctive relief. Specifically, the court held that Appellants had not shown that they would be irreparably harmed if the PPA continued to enforce the Regulations. *See Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mt., Inc.,* 573 Pa. 637, 828 A.2d 995, 1001–1002 (2003) (holding, *inter alia,* that a preliminary injunction will not issue if the party seeking it does not show that the injunction "is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages"). The court also raised the issue of jurisdiction *sua sponte* and held it for briefing and consideration *en banc.* Finally, in March 2007, the Commonwealth Court held that it did not have original jurisdiction over the matter and transferred the case to the Philadelphia County Court of Common Pleas for resolution on the merits. On Appellants' motion, the Commonwealth Court

5. 45 Pa.C.S. §§ 501–907.

certified its order for immediate appeal. Pa. R.A.P. 1311(b); 42 Pa.C.S. § 702(b).

This Court granted permission to appeal because the issue of whether the PPA is a Commonwealth agency as opposed to a local agency under these circumstances remains unresolved. *See, e.g., City of Philadelphia v. Phila. Parking Auth.,* 568 Pa. 430, 798 A.2d 161 (2002) (in a per curiam order, this Court remanded matter relating to the constitutionality of the 2001 Parking Authorities Law to the Commonwealth Court for decision on the merits within that court's original jurisdiction).[6] Pa. R.A.P. 1311(b); 42 Pa.C.S. § 702(b).

**Discussion**

When reviewing questions of subject matter jurisdiction, our standard and scope of review are well established:

> Jurisdiction over the subject matter is conferred solely by the Constitution and laws of the Commonwealth. The test for whether a court has subject matter jurisdiction inquires into the competency of the court to determine controversies of the general class to which the case presented for consideration belongs. Thus, as a pure question of law, the standard of review in determining whether a court has subject matter jurisdiction is *de novo* and the scope of review is plenary. Whether a court has subject matter jurisdiction over an action is a fundamental issue of law which may be raised at any time in the course of the proceedings, including by a reviewing court *sua sponte.*

*In re Administrative Order No. 1–MD–2003, Appeal of Troutman,* 594 Pa. 346, 936 A.2d 1, 5 (2007).

In Pennsylvania, the Commonwealth Court has original jurisdiction over civil actions against the Commonwealth government. 42 Pa.C.S. § 761(a)(1).[7] The Commonwealth government includes agencies of the Commonwealth but not "any

---

6. On remand, the City of Philadelphia joined the Governor of Pennsylvania as a defendant and the issue of jurisdiction became moot. 42 Pa.C.S. § 761(a)(1); *see City of Philadelphia v. Schweiker,* 817 A.2d 1217 n. 1 (Pa.Commw.2003).

7. Section 761 contains five exceptions to this general rule that are not applicable here. 42 Pa.C.S. § 761(a)(1).

political subdivision, municipal or other *local authority*." 42 Pa.C.S. § 102 (emphasis added). Hence, we must determine whether or not the PPA is a "local authority" to decide whether original jurisdiction rests in the Commonwealth Court or in the Philadelphia County Court of Common Pleas.

According to the rules of statutory construction, a local authority is "a municipal authority or any other body corporate and politic created by one or more political subdivisions pursuant to statute." 1 Pa.C.S. § 1991. Title 53, however, defines parking authorities, including the PPA, as "public bod[ies] corporate and politic, exercising public powers of the Commonwealth as agenc[ies] of the Commonwealth." 53 Pa. C.S. § 5505(a)(1).

In 1976, this Court answered a similar jurisdictional question in the context of the Housing Authorities Law. The Housing Authorities Law, 35 P.S. §§ 1541–1568.1, like the Parking Authorities Law, contained a provision deeming the authorities to be Commonwealth agencies. *T & R Painting Co. v. Phila. Housing Auth.*, 466 Pa. 493, 353 A.2d 800, 801 (1976) (*T & R Painting*). According to the statute, "[a Housing] Authority shall constitute a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof." 35 P.S. § 1550. This Court decided, however, that the language of Section 1550 was not dispositive because the Housing Authorities Law also contained numerous provisions that indicated that housing authorities were local agencies. *T & R Painting*, 353 A.2d at 802. According to the Court, because the statute contained contradictory language, it had to consider the General Assembly's intent. *Id.*

This Court ultimately decided that the Philadelphia Housing Authority (PHA) was a local agency and that, as a result, the Commonwealth Court did not have original jurisdiction over the action. *Id.* at 802. The Court held that when the General Assembly granted the Commonwealth Court jurisdiction over actions against the Commonwealth but not local agencies, it provided "a judicial forum for the uniform and consistent resolution of questions of statewide impact." *Id.* at 802. In

dealing with litigation involving the PHA, the Commonwealth Court would not be faced with statewide issues but, rather, with local Philadelphia issues because the PHA is an agency controlled by local government that has a local mission. *Id.*[8]

In 2004, in *James J. Gory Mech. Contracting, Inc. v. Phila. Housing Auth.*, 579 Pa. 26, 855 A.2d 669 (2004) (*Gory*), this Court revisited the issue, reasserting the vigor of and further explaining the test adopted in *T & R Painting. Gory*, 855 A.2d at 677–78. In *T & R Painting*, this Court had held that "questions of statewide impact" should be resolved in the Commonwealth Court, because that court was "intended to provide a judicial forum for the uniform and consistent resolution of questions of statewide impact." *T & R Painting*, 353 A.2d at 802. In *Gory*, the Court refined the test to say that "the pivotal factors to be looked at are whether the entity operates on a statewide basis and is predominantly controlled by the state." *Gory*, 855 A.2d at 678. The Court applied the *T & R Painting* test and held again that the PHA was a local agency for the purpose of jurisdiction. The Court also held that an authority could have a different status "depending on the issue for which the determination is being made." *Id.*

**8.** The Court also said that

To reach any other conclusion than that the authority is a local agency which may be sued in the local court of common pleas rather than in the Commonwealth Court would lead to the absurd and unreasonable result that a citizen would be required to pursue his remedy in Harrisburg even though the records were located in the community and the agency involved had been created by an individual city or county and the issues involved were matters strictly within the concern of a particular locality rather than a concern of the Commonwealth generally. The General Assembly, of course, could not have intended such a result.

*T & R Painting Co. v. Phila. Housing Auth.*, 466 Pa. 493, 353 A.2d 800, 802 (1976). The PPA, like the PHA, has some local functions, such as the management of on and off-street parking in Philadelphia, including issuance of parking tickets and collection of fines for parking violations. 53 Pa.C.S. § 5505(b), (d). Those purely local functions are not at issue in this case. Disputes arising out of these local operations are properly relegated to the original jurisdiction of the Philadelphia County Court of Common Pleas. *See E–Z Parks, Inc. v. Larson*, 91 Pa.Cmwlth. 600, 498 A.2d 1364 (1985), *aff'd per curiam*, 509 Pa. 496, 503 A.2d 931 (1986) (holding that the PPA was a local agency for jurisdictional purposes in a dispute involving the PPA's parking operations).

This Court considered different factors and the legislative intent behind the Judicial Code. *Id.* As in *T & R Painting*, the Court noted that the General Assembly intended the Commonwealth Court to serve as an original forum for issues of statewide concern that must be uniformly decided. *Id.* at 678. Thus, for jurisdictional purposes, "the pivotal factors ... are whether the entity operates on a statewide basis and is controlled by the state." *Id.*[9]

Applying the tests formulated in *T & R Painting* and *Gory*, we hold that the Commonwealth Court is the proper forum for the Appellants' challenge to the Regulations adopted under Chapter 57 of Title 53.

The General Assembly deemed parking authorities, like housing authorities, to be agencies of the Commonwealth. 53 Pa.C.S. § 5505. According to the statute, "[t]he authority shall constitute a public body corporate and politic, exercising public powers of the Commonwealth as an agency of the Commonwealth." 53 Pa.C.S. § 5505.[10] But, as in the Housing Authorities Law, the General Assembly also introduced language in the Parking Authority Law to indicate that parking authorities were local entities. 53 Pa.C.S. §§ 5504, 5509, 5514, 5516.[11] As a result, we must inquire into the General Assem-

**9.** On the other hand, for the purposes of determining immunity, the important factor was whether "the entity was created by the state to perform a state function so that a judgment against it would, in essence, injure the state." *Gory* 855 A.2d at 677; *see also Marshall v. Port Auth. of Allegheny Cnty.*, 524 Pa. 1, 568 A.2d 931, 934 (1990) (holding that because the language in the enabling statute is clear the Port Authority of Allegheny County is a Commonwealth agency for the purposes of sovereign immunity).

**10.** *Compare* 35 P.S. § 1550 ("[A Housing] Authority shall constitute a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof").

**11.** The dissent discusses at length the language in the Parking Authority Law that indicates that the PPA is a local agency. Dissenting Op. at 237–41. That discussion suggests that the "local agency" language in the law is dispositive of the jurisdictional issue despite equally persuasive language to the contrary. *See, e.g.,* 53 Pa.C.S. § 5505. Respectfully, this approach does not coincide with *Gory*. In *Gory*, this Court looked at the language of the Housing Authorities Law only to confirm that the language is ambiguous regarding the jurisdictional question. *Gory,* 855 A.2d at 677; *Marshall,* 568 A.2d at 934. Once it determined

bly's intent. *T & R Painting*, 353 A.2d at 802. *See also Gory*, 855 A.2d at 674–75. In addition, we must consider whether a court's decisions in PPA taxicab matters will have statewide import or whether the impact will be limited to Philadelphia only. *Gory*, 855 A.2d at 678. As this Court explained,

> where the entity acts throughout the state and under the state's control, it is clearly meant to be a Commonwealth agency for jurisdictional purposes so that it may be sued in the Commonwealth Court. In contrast, where the entity operates within a single county or municipality and is governed in large part by that county or municipality, the entity must be characterized as a local agency and sued in the trial courts because the trial courts will be more familiar with the issues surrounding the entity's operations and organizational make-up.

*Id.* The salient factors in our analysis are whether the PPA operates statewide and whether it is controlled by the state. *Id.*

With regard to taxicabs, the PPA operates outside of Philadelphia and statewide. According to Chapter 57 of Title 53, taxicabs must obtain certificates of public convenience and medallions from the PPA if they operate:

(1) between points in the city of the first class for which its certificate is issued;

(2) from any point in the city of the first class for which its certificate is issued *to any point in this Commonwealth;*

(3) *from any point in this Commonwealth* to any point in the city of the first class for which its certificate is issued if the request for service for such transportation is received by call to its centralized dispatch system; and

that the language was ambiguous, the Court analyzed whether the PHA was a local agency by looking at "whether the entity operates on a statewide basis and is controlled by the state" or not. *Gory*, 855 A.2d at 678 (considering facts that PHA has a governing body appointed by Philadelphia City Council and is operated within Philadelphia's boundaries only).

(4) from any point in the city of the first class for which its certificate is issued *to any point outside this Commonwealth* as a continuous part of a trip.

53 Pa.C.S. § 5714(a), (c) (emphasis added).[12]

Moreover, the PPA shares the responsibility for regulating taxicab operations in the Commonwealth with the PUC. 53 Pa.C.S. § 5722. PUC-licensed taxicabs operate statewide. 66 Pa.C.S. § 2502(a)(1); 53 Pa.C.S. § 5714(d)(1). They may transport persons and property "from any point in a city of the first class to any point in this Commonwealth beyond that city of the first class if the request for service for such transportation is received by call to its radio dispatch service." 53 Pa.C.S. § 5714(d)(1). Like PUC-licensed taxicabs, PPA-licensed taxicabs may also travel to other parts of the Commonwealth and to other states. 53 Pa.C.S. § 5714(c)(2)-(3). The PPA is responsible for the high volume Philadelphia area while the PUC is responsible for the remaining parts of the Commonwealth. 53 Pa.C.S. § 5505(d).[13] The two agencies'

**12.** The dissent points to the Southeastern Pennsylvania Transportation Authority (SEPTA) and argues that SEPTA also travels across county lines and that jurisdiction over actions against SEPTA has nonetheless traditionally rested in the Philadelphia Court of Common Pleas. Dissenting Op. at 236–37, 242. First, this is only one of three arguments supporting our holding that court decisions in PPA cases have a statewide impact. Second, the SEPTA-enabling statute is substantially different from the Parking Authority Law. *See, e.g.,* 74 Pa.C.S. §§ 1752 (budget), 1711 (creation of SEPTA), 1712 (appointment of board members). Thus, although this Court has not spoken on the jurisdictional issue in SEPTA's case, and we will not do so here because the issue is not before us, we nonetheless observe that SEPTA's organizational and financial structure contains more indicators that it is a local agency than does PPA's structure.

**13.** The General Assembly recognized that:

Due to the size, total population, population density and volume of both tourism and commerce of a city of the first class, it may be more efficient to regulate the taxicab and limousine industries through *an agency of the Commonwealth with local focus* than an agency with diverse Statewide regulatory duties. Well-regulated local focus on improving those industries can be an important factor in the continual encouragement, development, attraction, stimulation, growth and expansion of business, industry, commerce and tourism *within a city of the first class, the surrounding counties and this Commonwealth as a whole.*

spheres of operation combine and overlap to create a system of ground transportation that is essential to the welfare of the Commonwealth "as a whole." 53 Pa.C.S. § 5701.1. The PPA and PUC together regulate the totality of Pennsylvania taxicabs and it is essential that the two entities operate harmoniously.

We must also consider that the Commonwealth Court has jurisdiction over actions against the PUC arising out of its taxicab regulatory functions. 42 Pa.C.S. § 761(a)(1); 66 Pa. C.S. §§ 510, 2501–2509; *and see United Parcel Serv. v. Pa. Pub. Util. Comm'n,* 574 Pa. 304, 830 A.2d 941, 948 n. 12 (2003) (*citing* 66 Pa.C.S. § 510(d)). The General Assembly's delegation of Philadelphia area taxicab operations to the PPA was part of a plan to streamline the Commonwealth's ground transportation system. 53 Pa.C.S. §§ 5502, 5701.1. This plan for streamlining the system surely would be undermined if decisions relating to PUC-licensed taxicabs were made in the Commonwealth Court originally and those relating to PPA-licensed taxicabs were not.

Furthermore, the PPA is controlled by the Commonwealth. The Governing Board of the PPA is appointed by the Governor of Pennsylvania. 53 Pa.C.S. § 5508.1(e). The Governing Board manages "the properties and business" of the PPA without any local government oversight. 53 Pa.C.S. § 5508.1(*o*).

The General Assembly oversees the PPA's budget, both as it relates to general and taxicab operations. The general

53 Pa.C.S. § 5701.1(3) (emphasis added). The dissent interprets the phrase "an agency of the Commonwealth with local focus" to mean local agency. Dissenting Op. at 298–01, 965 A.2d at 240–41. According to the dissent, the shift to PPA of control over taxicabs in the Philadelphia area indicates the General Assembly's intent to depart from statewide control over taxicabs. Dissenting Op. at 301–04, 965 A.2d at 242. This argument is unpersuasive, however, because the General Assembly, in giving control of taxicab regulations to the PPA, also transferred PPA control from local to state officials. Thus, a more likely explanation is that the General Assembly perceived a need to relieve PUC of its high volume Philadelphia taxicab-related duties and so it transferred these to an existing authority, the PPA. This intent may also be gleaned from the imperative that the PPA keep the taxicab, limousine, and parking budgets separate. 53 Pa.C.S. § 5707(b)-(c).

budget receives revenues from the PPA's on-street and off-street parking operations. 53 Pa.C.S. §§ 5510, 5505. With respect to the general budget, the PPA must conduct an annual audit and submit copies to the municipality as well as to the Commonwealth's executive and legislative branches. 53 Pa.C.S. § 5510.1(e). The statute also requires that the PPA dispose of its budget in specific ways: the first $25 million goes to the City of Philadelphia and any excess goes to the general fund of Philadelphia's school district. 53 Pa.C.S. § 5508.1(Q.1)(2). In the words of Justice Saylor, "by obliging [the] PPA to channel substantial revenues to school funding, the General Assembly has directly employed [the] PPA as an instrumentality in furtherance of the Legislature's own constitutional obligation to provide for the maintenance and support of a thorough and efficient system of public education." *City of Philadelphia v. PPA*, 798 A.2d at 171 (Saylor, J., *dissenting*) (*citing* PA. CONST. Art. III § 14).[14]

The PPA's separate Taxicab Regulatory Fund is overseen by the General Assembly and not by the City of Philadelphia's government. 53 Pa.C.S. § 5707. According to Section 5707, the General Assembly may reject the PPA's annual budgetary, fare and fee proposals that finance the Taxicab Regulatory Fund. 53 Pa.C.S. § 5707(b). Although the General Assembly is not authorized to negotiate budget changes or otherwise have stricter control, this inability arises only out of the PPA's status as an "independent" Commonwealth agency rather than its status as any type of local agency. 53 Pa.C.S. § 5505(d)(23) (the PPA is "to act as an independent administrative commission for the regulation of taxicabs and limousine service"). The PPA may use money from the Taxicab Regulatory Fund to cover the costs of regulating taxicabs and of other administrative expenses shared within the PPA. 53 Pa.C.S. § 5708(b)-(c). Finally, the General Assembly has the right to examine "the books, accounts and records of the authority at any time." 53 Pa.C.S. § 5707(d).

14. Article III, Section 14, of the Pennsylvania Constitution states that: "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth."

The PPA created by the 2001 amendments is an entity unlike any other in Pennsylvania. Commonwealth officials control not only its governing structure but also its funding. In addition, with respect to taxicab regulation, the PPA is an entity whose actions have statewide impact.[15] For these reasons, the Commonwealth Court is the proper original forum in which to bring challenges to the PPA's taxicab regulatory scheme. *Gory,* 855 A.2d at 678.

### Conclusion

We hold that the Philadelphia Parking Authority is a Commonwealth agency for the purposes of regulating taxicabs.[16] The Commonwealth Court has original jurisdiction over actions arising under the Taxicab and Limousine Chapter of the Pennsylvania Consolidated Statutes Title 53, 53 Pa.C.S. § 5701–5745, including the instant dispute. We therefore reverse and remand this action to the Commonwealth Court for further proceedings on the merits.

Order reversed.

Chief Justice CASTILLE, and Justices SAYLOR, EAKIN and TODD join the opinion.

Justice McCAFFERY files a dissenting opinion in which BAER joins.

Justice McCAFFERY, dissenting.

I must respectfully dissent because I believe (1) the majority's conclusion that the Philadelphia Parking Authority

**15.** The dissent states "the PPA's extra-City taxicab and limousine jurisdiction involves vehicles shuttling suburbanites to and from the Philadelphia International Airport or transporting patients to and from hospitals or other medical facilities that lie within or *just without* the border of the City." Dissenting Op. at 242 (emphasis in original). First, we note respectfully that this assertion is outside the record before us. Second, even if we assume it is true, that does not change the fact that taxis and limousines regulated by the PPA are indeed authorized under the governing statutes to "[fan] out across the state to its far-flung boundaries," *id.,* and may do so at will.

**16.** As we emphasized in footnote 8, we need not decide whether the Commonwealth Court or the Philadelphia County Court of Common Pleas has original jurisdiction over actions arising out of the PPA's other functions. That issue is not before us.

("PPA") is a statewide agency is unsupportable; and, more importantly, (2) the statutes addressing (a) parking authorities [1] and (b) taxicabs and limousines in first class cities [2] signal the legislature's intent that the PPA is to be treated as a local authority for purposes of original jurisdiction over many if not most civil actions brought against it, including the underlying dispute in this case.

The Commonwealth Court has original jurisdiction over civil actions brought against or by the "Commonwealth government." 42 Pa.C.S. § 761. Specifically exempted from the definition of "Commonwealth government" are, among other things, "local authorit[ies]." 42 Pa.C.S. § 102. The legislative intent behind placing original jurisdiction over civil actions against local authorities in the courts of common pleas as opposed to the Commonwealth Court, *despite that court's expertise in matters of administrative agency law,* has been well explained by this Court:

> The Commonwealth Court [in its original jurisdiction] is intended to provide a judicial forum for *the uniform and consistent resolution of questions of statewide impact.* In accordance with this principle, ... for example, an action against the Department of Environmental Resources ("DER") must be brought in the Commonwealth Court, rather than in the trial court, because otherwise DER would be severely handicapped whenever trial courts reached different resolutions regarding its powers and duties. In contrast, ... there is no particular need for such uniform statewide resolution of issues involving the powers and duties of local authorities which operate within a single county, city or other municipality of the State ... as housing authorities do.

\* \* \*

1. Act of June 19, 2001, P.L. 287, *as amended,* 53 Pa.C.S. §§ 5501–5517 (hereinafter "the Parking Authorities Law").

2. Act of December 30, 2002, P.L. 2001, reenacted and amended by the Act of July 16, 2004, P.L. 758, No. 94, 53 Pa.C.S. §§ 5701–5745 (hereinafter the "First–Class City Taxicab Law").

To reach any other conclusion than that the authority is a local agency which may be sued in the local court of common pleas rather than in the Commonwealth Court would lead to the absurd and unreasonable result that a citizen would be required to pursue his [or her] remedy in Harrisburg even though the records were located in the community and the agency involved had been created by an individual city or county and the issues involved were matters strictly within the concern of a particular locality rather than a concern of the Commonwealth generally. The General Assembly, of course, could not have intended such a result.

*James J. Gory Mechanical Contracting, Inc. v. Philadelphia Housing Authority,* 579 Pa. 26, 855 A.2d 669, 675 (2004) (quoting *T & R Painting Co. v. Philadelphia Housing Authority,* 466 Pa. 493, 353 A.2d 800, 802 (1976)) (emphasis added; citations, footnote, and most quotation marks omitted).

The confusion that *for years* has arisen over the issue of original jurisdiction in civil actions against local authorities stems from language in the governing legislation creating such authorities, wherein the authorities are described as agencies of the Commonwealth.[3] As the Commonwealth Court has explained, in an analysis cited with approval by this Court:[4]

The difficulty in determining the status of ... any authority, is directly related to the reasons behind their creation and authorization by the General Assembly. Although authorities owe their existence to the various units of government and their governing boards are appointed by those entities, they are not considered part of the normal governmental structure. Unlike municipal corporations that have "governmental" and "proprietary" functions, authorities en-

**3.** *See, e.g.,* 53 Pa.C.S. § 5505(a)(1) (describing a parking authority as "a public body corporate and politic, exercising public powers of the Commonwealth as an agency of the Commonwealth"); 35 P.S. § 1550 (describing a housing authority as "a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof").

**4.** *See City of Philadelphia v. Schweiker,* 579 Pa. 591, 858 A.2d 75, 78–79 (2004).

gage only in the latter. Authorities are "public corporations, being corporate agencies engaged in the administration of civil government." *Lighton v. Abington Township,* 336 Pa. 345, 353, 9 A.2d 609, 613 (1939). Generally, authorities are established for the purpose of financing and managing various revenue producing projects of a public nature or other activities that are not considered to be part of core governmental activities; they are a governmental business venture, a form of quasi-privatization. The circumstances prompting their creations are usually for one or more of the following reasons:

> • the need for an administrative agency to manage public enterprises which, in certain case, have commercial characteristics, *e.g.,* Metropolitan Transportation Authorities (SEPTA); *Parking Authorities;*
>
> • the need for an agency which can cross governmental boundary lines for the effective handling of intercommunity problems, *e.g.,* SEPTA;
>
> • the need for a method to carry out activities that are constitutionally or statutorily proscribed such as the need to finance public improvements without running afoul of the constitutional limits on debt[,] (*see Lesser v. Warren Borough,* 237 Pa. 501, 85 A. 839 (1912))[,] and more recently, to give or lend federal funds given to local governments for community development that otherwise would be constitutionally proscribed by Article 9, Section 9 of the Pennsylvania Constitution.

While the first two reasons for the creation are very similar to reasons why a private corporation would create a subsidiary to carry out an enterprise or would enter into joint venture with another company, the last reason, the need to avoid constitutional impediments, is the one that causes the confusion as to whether authorities are part of the Commonwealth and, if so, for what purposes. *Because of the need to get around these constitutional impediments, the legislation authorizing the creation of authorities contains language that the authority is not an agency of the governmental unit(s) that creates it and appoints its board members,*

*but is considered an agency of the Commonwealth.* Typical of the language contained in most acts is the language [now] contained in ... 74 [Pa.C.S. § 1711(a)], which states that:

> An authority shall in no way be deemed to be the instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof.

Even when the authorizing legislation is silent, because of the reason behind the creation of authorities to avoid restrictions on local governments, those authorities are still considered an instrumentality of the Commonwealth. *See Application of the Municipal Authority of The Township of Upper St. Clair,* 408 Pa. 464, 184 A.2d 695 (1962).

*SEPTA v. Union Switch & Signal, Inc.,* 161 Pa.Cmwlth. 400, 637 A.2d 662, 664–66 (1994) (emphasis added; footnotes omitted).

Consequently, this Court and the Commonwealth Court have long held that "Commonwealth *government*" for purposes of determining whether the Commonwealth Court or the court of common pleas has original *jurisdiction* in a case is not the equivalent of "Commonwealth *party*" for purposes of determining whether the defense of sovereign *immunity* or local governmental immunity applies. *See Gory, supra* at 677–79 (holding that although entitled to sovereign immunity as a Commonwealth party, the Philadelphia Housing Authority ("PHA")was a *local agency* for purposes of jurisdiction, and therefore original jurisdiction of the underlying contract action rested in the court of common pleas); *see also Fraternal Order of Transit Police v. SEPTA,* 668 A.2d 270, 272 (Pa. Cmwlth.1995) (stating that "whether an entity is the 'Commonwealth government' for purposes of jurisdiction or whether it is a 'Commonwealth agency' for purposes of immunity from suit are two distinct issues."); *Quinn v. SEPTA,* 659 A.2d 613, 616 (Pa.Cmwlth.1995) (holding that for purposes of jurisdiction, SEPTA is, and has always been, treated as a local agency and not an agency of the Commonwealth); *Union Switch & Signal, supra* at 666 (recognizing that the fact that

an authority may be considered "an instrumentality of the Commonwealth," does not make the authority "the Commonwealth" for all purposes; rather, the intent of the General Assembly must be gleaned from the relevant legislation in order to ascertain the authority's status).[5]

Thus, for purposes of determining which court has original jurisdiction in the present case, it is of little or no moment that a local parking authority is described in the Parking Authorities Law as "a public body corporate and politic, exercising public powers of the Commonwealth as an agency of the Commonwealth." 53 Pa.C.S. § 5505(a)(1). Rather, the entirety of the governing legislation must be examined to determine whether the legislature intended the authority to be a local authority or the Commonwealth government for purposes of jurisdiction in civil suits brought against it. *Gory*, *supra* at 673, 678 (holding that the statutory designation of the PHA as an agency of the Commonwealth must be read with the other provisions of the statute, and, once read, establishes the inescapable conclusion that the PHA is a *local authority* for purposes of determining the issue of which court has original jurisdiction).

My review of the Parking Authorities Law and the First–Class City Taxicab Law compels me to conclude that the *Philadelphia* Parking Authority, like other local parking authorities, is indeed, by its nature and function, a *local* authority. This review leads me to conclude further that the legislature did not intend to alter the longstanding law in this Commonwealth that original jurisdiction over actions against local authorities, including the PPA, lies in the courts of common pleas, except for *certain specific controversies* involving the PPA where the legislature has *specifically provided*

5. *See also* G. Ronald Darlington, *et al., Pennsylvania Appellate Practice* § 40:308 (2008–2009 ed.), stating that: "[Local] authorities are ... not the Commonwealth for purposes of the Commonwealth Court's jurisdiction. To hold otherwise would expand [that] court's trial duties to include resolution of disputes that do not require consistent statewide results and expand the number of cases that could be appealed as of right to the Supreme Court."

that original jurisdiction lies in the Commonwealth Court. *See* discussion *infra.*

There is no need to list the many provisions in the Parking Authorities Law that evidence the fact that parking authorities, including the PPA, whose duties are principally devoted to managing on- and off-street parking facilities and charging and collecting rates at these facilities *solely within their localities,* are indeed *local* authorities and lack a statewide reach. Suffice it to say, they are legion. *See, e.g.,* 53 Pa.C.S. § 5505 (concerning the purposes and powers of parking authorities, including the PPA). The PPA, like all local parking authorities, was created by ordinance of the local municipality, here the City of Philadelphia, in 1950. *See City of Philadelphia v. Schweiker,* 579 Pa. 591, 858 A.2d 75, 79 (2004). Despite changes to the Parking Authorities Law that shifted the political control of the PPA from the City to the Commonwealth,[6] the PPA's functions—and its geographical impact— have essentially remained the same. The significant addition to the PPA's duties was its assumption of regulation of *local* taxicabs and limousines. *See* 53 Pa.C.S. § 5505(d)(23) (granting the PPA the authority to "act as an independent administrative commission for the regulation of taxicabs and limousine service"); and the First–Class City Taxicab Law *generally.* However, as I shall discuss in more detail *infra,* these additional local duties do not make the PPA the Commonwealth government.

Moreover, as we are asked here to determine an issue of original jurisdiction, I believe it behooves this Court to examine, as the majority has failed to do, how the legislature *actually addresses* the issue of jurisdiction in the Parking Authorities Law itself,[7] as this examination would surely be instructive. The Parking Authorities Law *specifically provides* that certain civil actions brought against the PPA are to be brought in the court of common pleas, and that other

---

**6.** *See Schweiker, supra* at 80.

**7.** The issue of jurisdiction is not directly addressed in the First–Class City Taxicab Law.

certain civil actions against PPA are to be brought in the Commonwealth Court.[8]

In Section 5505 of the Parking Authorities Law, the same section that describes a parking authority as "an agency of the Commonwealth," one subsection is devoted to the power of a parking authority to "fix, alter, charge and collect rates and other charges for its facilities at reasonable rates" as determined exclusively by the parking authority. 53 Pa.C.S. § 5505(d)(9). This subsection further provides:

> Any person questioning the reasonableness of rates fixed by the authority may *bring suit against the authority in the court of common pleas* of the judicial district where the project is located. *The court of common pleas shall have exclusive jurisdiction to determine the reasonableness of the rates and other charges.* This paragraph supersedes a contrary provision in any home rule charter, ordinance or resolution.

*Id.* (emphasis added).

Notably, no exception is made for a city of the first class. Indeed, the subsection's reference to "home rule charter" indicates a legislative intent to *include* a city of the first class. Moreover, it would be difficult to argue with the wisdom of consigning to the courts of common pleas original jurisdiction over disputes concerning the reasonableness of local rates and charges imposed by the PPA, as this is surely not an issue of statewide importance.

Section 5508.1 of the Parking Authorities Law is entitled "Special provisions for authorities in cities of the first class." 53 Pa.C.S. § 5508.1. Notably, there is *not* a special provision that places original jurisdiction in the Commonwealth Court over all actions against an authority of the city of the first class (the PPA), despite the legislature's presumed knowledge

---

**8.** The legislature did not craft a specific provision concerning the court of original jurisdiction for the issue before us, which involves a challenge to the PPA's taxicab and limousine regulations. As I discuss *infra*, I believe that the Parking Authorities Law and the First–Class City Taxicab Law make plain that the PPA is a local authority for this action, and therefore original jurisdiction lies in the court of common pleas.

of the wealth of case law holding that original jurisdiction for actions against local authorities, *including the PPA*, lies in the courts of common pleas. *See, e.g., E–Z Parks, Inc. v. Larson,* 91 Pa.Cmwlth. 600, 498 A.2d 1364 (1985), *aff'd.,* 509 Pa. 496, 503 A.2d 931 (1986) (holding that the PPA is a local agency or authority and not a part of Commonwealth government).

However, a subsection of Section 5508.1 devoted to the enforcement and administration of on-street parking in a city of the first class, and directing the distribution of revenue from the PPA to the city and the city's school district, specifically provides:

> If a dispute arises between the city and the authority concerning the administration of the system of on-street parking regulation as provided for in this subsection or in the event of a breach or threatened breach of the provisions of this subsection, either the city or the authority may, *in the Commonwealth Court,* by mandamus or other proceeding at law or in equity:
>
> > (i) enforce the proper manner of administration of the system of on-street parking regulation as provided for in this subsection;
> >
> > (ii) compel the other party and the officers, employees and agents thereof to carry out the provisions of this subsection; or
> >
> > (iii) require the other party to account, as if it were the trustee of an express trust for the other party, for any revenues received that are required to be paid to the other party.

53 Pa.C.S. § 5508.1(q.1)(5) (emphasis added).[9]

Therefore, the Parking Authorities Law specifically provides that for certain actions against the PPA, the courts of

9. Further, Section 5508.3 of the Parking Authorities Law specifically provides that a first-class city authority (the PPA) "shall be subject to *and treated as a Commonwealth agency* for purposes of the act ... referred to as the Right–to–Know Law," which shall apply to such authority. 53 Pa.C.S. § 5508.3(a)(2) (emphasis added). Additionally, Section 5508.3 provides that PPA employees shall be treated as Commonwealth employees, and PPA officers and board members shall be

common pleas shall have original jurisdiction, and in other actions (where there is a dispute between the city and the PPA over one of the PPA's most significant functions and responsibilities) the Commonwealth Court shall have original jurisdiction. I believe that one should not conclude that because the Parking Authorities Law mentions that in one instance, concerning a specific type of controversy, original jurisdiction lies in the Commonwealth Court, the legislature thus intended to make the PPA part of the Commonwealth government. In addition to actions against or by the Commonwealth government, the Commonwealth Court *also* has original jurisdiction where "vested in the Commonwealth Court by any statute hereafter enacted." 42 Pa.C.S. § 761(a)(4). Section 5508.1(q.1)(5) of the Parking Authorities Law is one such "statute hereafter enacted."

One of the principal arguments made in this case for asserting that the Commonwealth Court has original jurisdiction are the fundamental changes made specifically to the PPA by Act 22 of 2001 ("Act 22")[10] and Act 94 of 2004 ("Act 94").[11] Act 22 unmistakably shifted power from the City of Philadelphia to the Commonwealth with respect to fundamental aspects of PPA governance and revenue direction,[12] and Act 94 effectively transferred the regulation of the local Philadelphia taxicab and limousine industry from the Public Utility Commission ("PUC") to the PPA.[13] However dramatic these

regarded as public officials of the Commonwealth, in the mandatory application of ethics, disclosure, and conflicts laws that are, by this section, made applicable to the authority. 53 Pa.C.S. § 5508.3(a)(1). Although Section 5508.3 does not specifically mention jurisdiction, its provisions undoubtedly will have an impact in determining any question of jurisdiction in actions against the PPA or its employees, officers, or board members, arising from the laws made applicable to the PPA by this section.

10. Act of June 19, 2001, P.L. 287.

11. Act of July 16, 2004, P.L. 758.

12. *See City of Philadelphia v. Philadelphia Parking Authority*, 568 Pa. 430, 798 A.2d 161 (2002) (Castille, J. concurring).

13. *See* 53 Pa.C.S. § 5505(d)(23) (granting the PPA the authority to "act as an independent administrative commission for the regulation of

changes were, there was no specific statutory change signaling that for purposes of the question of original jurisdiction, the PPA was to be now considered the Commonwealth government. As seems clear from the above-cited statutory provisions of the Parking Authorities Law, the conclusion would appear to be the opposite. Section 5505(d)(9) specifically places jurisdiction over disputes against the PPA concerning the reasonableness of rates and charges in the courts of common pleas. Section 5508.1(q.1)(5) specifically places jurisdiction over disputes between the PPA and the City of Philadelphia concerning the administration of on-street parking and the direction of the PPA's revenues in the Commonwealth Court. If the PPA were now the Commonwealth government as a result of Act 22 and/or Act 94, original jurisdiction in the courts of common pleas would not lie, and the Parking Authorities Law would not have to specifically state that the Commonwealth Court had original jurisdiction over specific, narrowly described legal disputes. Had the legislature, in all of its sweeping changes to the PPA in Acts 22 and 94, intended that the PPA be the Commonwealth government and that all civil actions against it accordingly now be tried in the Commonwealth Court's original jurisdiction, as opposed to former practice, it could have so stated. It did not. For purposes of original jurisdiction, except for certain specifically identified instances, it left the *Philadelphia* Parking Authority to be what it most certainly is—a local parking authority.

Further, and contrary to the majority opinion's conclusions, I conclude that Act 94, which shifted regulatory responsibility of taxicabs and limousines with a Philadelphia nexus from the PUC to the PPA, evidenced a legislative intent to shift original jurisdiction for disputes over such matters from the Commonwealth Court to the courts of common pleas, not to corral the PPA into the orbit of the Commonwealth Court's original jurisdiction. Section 7 of Act 94, setting forth the legislative findings, specifically provides:

taxicabs and limousine service"); and the First–Class City Taxicab Law *generally.*

Due to the size, total population, population density and volume of both tourism and commerce of a city of the first class, *it may be more efficient to regulate the taxicab and limousine industries through an agency of the Commonwealth with local focus than an agency with diverse State-wide regulatory duties.* Well-regulated *local focus* on improving those industries can be an important factor in the continual encouragement, development, attraction, stimulation, growth and expansion of business, industry, commerce and tourism within a city of the first class, the surrounding counties and this Commonwealth as a whole.

53 Pa.C.S. § 5701.1(3) (emphasis added).

Thus, the legislature specifically found that the regulation of the Philadelphia area taxicab and limousine industry, with its specific concerns, is best achieved by a *local authority* with a *local focus.* Indeed, it had made little sense for specific Philadelphia taxicab and limousine issues, which include Philadelphia's unique certificate of convenience and medallion system,[14] to continue to be regulated by a statewide agency and, correspondingly, that actions against the PUC concerning matters unique to Philadelphia be tried in the Commonwealth Court's original jurisdiction.

The local flavor of the Philadelphia taxicab and limousine industry is distinctly defined in the First–Class Taxicab Law and ably summarized by the Commonwealth Court in the opinion below, as follows:

In general, for a taxicab or limousine to operate in Philadelphia, it must have a certificate of public convenience issued by PPA. 53 Pa.C.S. §§ 5714(a), 5741(a).

*A taxicab or limousine authorized by a certificate of public convenience issued by PPA* may transport persons: 1) between points in Philadelphia; 2) from any point in Philadelphia to any point in the Commonwealth; 3) from any point in the Commonwealth to any point in Philadelphia *if the request for service for such transportation is received by*

14. *See* 53 Pa.C.S. §§ 5712, 5714(a) and 66 Pa.C.S. § 2401–2416 (repealed).

*call to its centralized dispatch system;* and 4) from any point in Philadelphia to any point outside the Commonwealth *as part of a continuous trip.* 53 Pa.C.S. §§ 5714(c), 5741(a.1). Meanwhile, taxicabs which are *not authorized by a certificate of public convenience issued by PPA* to provide services in Philadelphia, *but which hold a certificate of public convenience from the PUC,* may still transport persons to Philadelphia and may transport persons from any point in Philadelphia to any point in the Commonwealth beyond Philadelphia if the request for service for such transportation is received by call to its radio dispatch service, *without being subject to the regulatory authority of PPA.* 53 Pa.C.S. § 5714(d)(1). Similarly, limousines which are not authorized by a certificate of public convenience issued by PPA to provide services in Philadelphia, but which hold a certificate of public convenience from the commission authorizing limousine service elsewhere in the Commonwealth, may still transport persons to Philadelphia and from any point in Philadelphia to any point in the Commonwealth beyond Philadelphia, excluding service from any airport, railroad station and hotel located in whole or in part in Philadelphia, *without being subject to the regulatory authority of PPA.* 53 Pa.C.S. § 5741(a.3).

*Blount v. Philadelphia Parking Authority,* 920 A.2d 215, 220–21 (Pa.Cmwlth.2007) (*en banc*) (emphasis added).

As can be seen, the authority of the PPA extends to only those taxicabs and limousines with a Philadelphia nexus, and its regulatory authority, and that of the PUC, *do not overlap in any significant manner,* as one might interpret the majority opinion to read.[15] Further, it is a grotesquely distorted

15. *See* op. at 285, 965 A.2d at 232, wherein the majority states: "Moreover, the PPA shares the responsibility for regulating taxicab operations in the Commonwealth with the PUC." The majority then cites to 53 Pa.C.S. § 5722, which pertains *solely* to the power of the PPA to issue rules and regulations pertaining to taxicabs. (A similar provision pertaining to limousines is set forth at 53 Pa.C.S. § 5742). A Jurisdictional Agreement between the PUC and the PPA, authorized by Act 94, sets forth in detail the shifting of regulatory authority from the PUC to the PPA for all affected taxicabs and limousines. *Only* for limousine carriers that will hold dual authority from the PUC and the

interpretation of the above provisions of the First–Class City Taxicab Law to conclude that they evidence a statewide reach of the PPA's powers, authorities, and duties. The majority emphasizes certain language set forth at 53 Pa.C.S. § 5714(c) concerning service from, *e.g.*, the City of Philadelphia *"to any point in this Commonwealth."* Majority op. at 285, 965 A.2d at 232 (quoting 53 Pa.C.S. § 5714(c)(2)). However, the provisions of 53 Pa.C.S. § 5714(c) apply *only* to those vehicles issued a certificate of convenience by the PPA, and thus apply *only* to vehicles *"with citywide call or demand rights in cities of the first class."* 53 Pa.C.S. § 5714(a) (emphasis added). In other words, these provisions describe the geographic areas within which the PPA taxicabs and limousines may operate. They do not require PPA certification for all taxicabs or limousines operating within these areas. *See also* 53 Pa.C.S. § 5741 *generally,* which tracks similar language pertaining to limousines that operate "within a city of the first class."

We need to ground ourselves in reality. The Philadelphia taxicab and limousine industry operates in the Philadelphia area with strict ties to Philadelphia. Only the *Philadelphia* taxicab and limousine industry falls under the jurisdiction of the PPA, an authority with a local reach, and except for regulating taxicabs and limousines that sometimes operate beyond the borders of Philadelphia, functions *solely* within the City of Philadelphia. Essentially, the PPA's extra-City taxicab and limousine jurisdiction involves vehicles shuttling suburbanites to and from the Philadelphia International Airport or transporting patients to and from hospitals or other medical facilities that lie within or *just without* the border of the City. Philadelphia taxicabs and limousines are not fanning out across the state to its far-flung boundaries. There is no PPA statewide impact in the governing statutes or in reality. Indeed, by essentially holding that the PPA is the Common-

PPA will there be dual PUC and PPA jurisdiction for trips to and from Philadelphia, with the exception of trips from an airport, railroad station, or hotel located, in whole or in part, in Philadelphia. In the latter case, the PPA has sole regulatory jurisdiction. 35 Pa.B. 1737.

wealth government with respect to its regulation of Philadelphia based taxicabs and limousines, the majority actually seems to derail the stated legislative intent of Act 94, which was to transfer regulation of these local vehicles from a statewide agency (the PUC) to a local authority with a "local focus." 53 Pa.C.S. § 5701.1(3).

Further, although the PPA's jurisdiction lies beyond the borders of Philadelphia with respect to taxicabs and limousines "with citywide call or demand rights," I do not conclude that this makes the PPA any less of a local authority for purposes of determining issues of original jurisdiction than the Southeastern Pennsylvania Transportation Authority, which operates in Philadelphia *and the surrounding counties*, and which has consistently been held to be a local agency for purposes of jurisdiction. *Fraternal Order of Transit Police, supra; Quinn, supra; Union Switch & Signal, supra.*[16]

Because I agree with the decision of the Commonwealth Court below that Acts 22 and 94 did not change the PPA's status as a local authority for purposes of original jurisdiction, except where specifically provided in the Parking Authorities Law, and because the PPA's duties with respect to its regulation of local taxicabs and limousines has only a local focus without any genuine statewide reach, I would affirm the decision of the Commonwealth Court transferring the underly-

16. I must respectfully disagree with the majority's overly-broad contention that "the SEPTA enabling statute is substantially different from the Parking Authorit[ies] Law" (op. at 232 n. 12). As the majority notes, the Commonwealth has a statutory role in the *creation* and *governance* of metropolitan transportation authorities, including SEPTA. Further, the Commonwealth must receive a yearly financial report from such authorities, contrary to the majority's assertions of purely local oversight of the authorities' budgets. *See* 74 Pa.C.S. § 1752. By contrast, the PPA is an entirely *local* creation of the City of Philadelphia (*see* majority op. at 227–28), and while its board members are appointed by the Commonwealth, all board members *must* be Philadelphia residents. 53 Pa.C.S. § 5508.1(d). Accordingly, I cannot agree with the majority that for purposes of the jurisdiction question before us, the legislation creating metropolitan transportation authorities is "substantially" different from those provisions of the Parking Authorities Law that concern the PPA.

304

ing dispute in this case to the court of common pleas. Accordingly, I dissent.