IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Independent Oil & Gas Association,

Petitioner

v.

Pennsylvania One Call System, Inc.,

Respondent

:
:
:
:
:
:
:
:
:
:
:
:

No. 507 M.D. 2019

Submitted: May 29, 2020

BEFORE:　HONORABLE RENÉE COHN JUBELIRER, Judge
　　　　　HONORABLE PATRICIA A. McCULLOUGH, Judge
　　　　　HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY
JUDGE McCULLOUGH　　　　　　　　　　　　FILED: January 5, 2021

Before the Court are the preliminary objections of Pennsylvania One Call System, Inc. (POCS), to the petition for review filed by Pennsylvania Independent Oil & Gas Association (PIOGA), which sought a declaratory judgment concerning the propriety of POCS' rate structure under what is known as the Underground Utility Line Protection Law (UULPL).[1] POCS' preliminary objections challenge the subject matter jurisdiction of this Court, assert that PIOGA has failed to state a claim under the UULPL, and contend that PIOGA's action is precluded by the business judgment rule. We sustain POCS' preliminary objection to this Court's jurisdiction, and accordingly offer no opinion concerning its remaining objections.

---

[1] Act of December 10, 1974, P.L. 852, No. 287, *as amended*, 73 P.S. §§176-86.

## Background

POCS is an organization originally formed by Allegheny County public utility companies in 1968, with the goal of providing a means by which excavators and owners of underground utility lines could communicate and avoid damage or disruption to subterranean utility equipment. POCS' operation ultimately expanded beyond Allegheny County and grew to cover all of Pennsylvania. POCS incorporated as a Pennsylvania nonprofit corporation in 1978, and in 1979, it attained tax-exempt Internal Revenue Service 501(c)(6)[2] status. The General Assembly enacted the first version of the UULPL in 1974. Beginning then, and continuing through its various revisions, the UULPL placed certain duties upon both a "One Call System"[3] and the various facility owners that use the system.

The instant dispute concerns the methodology by which POCS sets the fees for using its service. On September 10, 2019, PIOGA filed a petition for review in this Court's original jurisdiction, seeking a declaratory judgment that POCS' fee structure fails to comply with the UULPL. Briefly summarized, PIOGA asserts that

---

[2] *See* 26 U.S.C. §501(c)(6) (exempting from taxation "[b]usiness leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual").

[3] The UULPL defines the "One Call System" as follows:

> "One Call System" means the communication system established within this Commonwealth to provide a single nationwide toll-free telephone number or 811 number for excavators or designers or any other person covered by this act to call facility owners and notify them of their intent to perform excavation, demolition or similar work as defined by this act. The One Call System shall be incorporated and operated as a nonprofit corporation pursuant to 15 Pa.C.S. Pt. II Subpt. C (relating to nonprofit corporations).

Section 1 of the UULPL, 73 P.S. §176.

POCS' fee structure is designed to recover a significantly greater proportion of its operating costs from the owners of utility facilities, when compared to the contractors that use POCS' service.[4] PIOGA seeks a determination that the fees for using POCS' service must be divided equally between contractors and facility owners. POCS' first

---

[4] The parties' dispute primarily centers upon the following fee-related provisions of the UULPL:

> (e) Operation costs for the One Call System shall be shared, in an equitable manner for services received, by facility owner members as determined by the One Call System's board of directors. Political subdivisions with a population of less than two thousand people or municipal authorities having an aggregate population in the area served by the municipal authority of less than five thousand people shall be exempt from the payment of any service fee. The One Call System may be reimbursed for its costs in providing this service from the contractor fees.

> (f) All fees shall be set by the board of directors and shall be based on the latest annual audited cost factors of the One Call System. Fees shall be set and adjusted to a rate not more than five percent above the audited cost factor plus the current average published Consumer Price Index for Pennsylvania. Costs of capital improvements may be added, if the improvement receives a majority vote of the board of directors.

> (f.1) An excavator, designer or operator who proposes to commence excavation or demolition work and requests information from the One Call System shall pay to the One Call System an annual fee for the service provided by the One Call System under section 3. The fee shall be set by the One Call System board of directors and shall be used to offset a portion of the operation costs of the One Call System and a portion of the operation costs levied on the One Call System's political subdivision and municipal authority members. Failure to pay the fee shall constitute a violation of this act and shall subject the excavator, designer or operator to the enforcement authority of the commission for the nonpayment.

Section 3.1(e)-(f.1) of the UULPL, added by the Act of November 29, 2006, P.L. 1593, 73 P.S. §178.1(e)-(f.1).

and central objection to PIOGA's action is that POCS is a private entity, not the "Commonwealth government," and, thus, that this Court lacks original jurisdiction over the matter. 42 Pa.C.S. §761(a)(1) (providing the Commonwealth Court with jurisdiction over actions "[a]gainst the Commonwealth government, including any officer thereof, acting in his official capacity").[5] Because PIOGA has not asserted any other basis for this Court's jurisdiction, and because no other such basis is apparent on the face of the pleadings, our initial inquiry centers upon whether POCS may be deemed to be a governmental entity notwithstanding its apparent status as a private, nonprofit corporation.

## Discussion

### A. Standard of Review

Our standard of review over preliminary objections is well-settled:

> In reviewing preliminary objections, all material facts averred in the complaint, and all reasonable inferences that can be drawn from them, are admitted as true. *Vattimo v. Lower Bucks Hospital, Inc.*, 465 A.2d 1231, 1232 (Pa. 1983); *Fletcher v. Pennsylvania Property & Casualty Insurance Guaranty Association*, 914 A.2d 477, 479 n.2 (Pa. Cmwlth. 2007), *aff'd*, 985 A.2d 678 (Pa. 2009). However, a court

---

[5] For purposes of our original jurisdiction, "Commonwealth government" is defined as:

> The government of the Commonwealth, including the courts and other officers or agencies of the unified judicial system, the General Assembly and its officers and agencies, the Governor, and the departments, boards, commissions, authorities and officers and agencies of the Commonwealth, but the term does not include any political subdivision, municipal or other local authority, or any officer or agency of any such political subdivision or local authority.

42 Pa.C.S. §102.

4

need not accept as true conclusions of law, unwarranted inferences, argumentative allegations, or expressions of opinion. *Portalatin v. Department of Corrections*, 979 A.2d 944, 947 (Pa. Cmwlth. 2009). "Preliminary objections should be sustained only in cases that are clear and free from doubt." *Pennsylvania AFL–CIO v. Commonwealth*, 757 A.2d 917, 920 (Pa. 2000).

*Seitel Data, Ltd. v. Center Township*, 92 A.3d 851, 859 (Pa. Cmwlth. 2014) (citations modified).

A challenge to a court's subject matter jurisdiction may be raised by preliminary objection. *See* Pa.R.C.P. No. 1028(a)(1). In a circumstance such as this, however, the proper disposition of the jurisdictional objection cannot be determined from the pleadings alone, for the determination of whether POCS is a private or a governmental entity turns upon our consideration of evidence relating to POCS' structure and operation. Both our precedent and our Rules of Civil Procedure acknowledge the fact-intensive nature of a preliminary objection of this sort. "There are basically two categories of preliminary objections[:] Those raising questions of fact outside the record and those which may be determined from the facts of record." *Chester Upland School District v. Yesavage*, 653 A.2d 1319, 1325 (Pa. Cmwlth. 1994). A demurrer is of the latter sort, and "may be determined from facts of record so that further evidence is not required." Pa.R.C.P. No. 1028(c)(2), *Note*. POCS' second and third preliminary objections are in the nature of demurrers, and the attempt to introduce evidence in support of either such objection would render it an impermissible "speaking demurrer." *See Minor v. Kraynak*, 155 A.3d 114, 124 (Pa. Cmwlth. 2017).

Here, POCS' jurisdictional challenge under Pa.R.C.P. No. 1028(a)(1), however, is of the sort that "cannot be determined from facts of record." Pa.R.C.P. No. 1028(c)(2), *Note*. "In such a case, the preliminary objections must be endorsed with a notice to plead or no response will be required." *Id.* The respondent bears the burden

to demonstrate the absence of jurisdiction, and only upon the presentation of evidence supporting the jurisdictional challenge does the burden shift to the petitioner. *Sawyers v. Davis*, 222 A.3d 1, 5 (Pa. Super. 2019). We have held that a mere allegation that the court lacks jurisdiction is insufficient to shift the burden to the petitioner; rather, the respondent "must first support its challenge to the court's . . . jurisdiction by presenting evidence." *Maleski by Taylor v. DP Realty Trust*, 653 A.2d 54, 61 (Pa. Cmwlth. 1994). "Only after the [respondent] has done so does the burden shift to the [petitioner] to adduce sufficient competent evidence to establish the court's jurisdiction." *Id.* Such evidence is not limited to deposition testimony, and "the burden may be met via affidavits or other competent evidence." *Id.*

POCS endorsed its preliminary objections with a notice to plead, and it supported its position with an affidavit from POCS' President and Chief Executive Officer, William G. Kiger, along with its articles of incorporation as a Pennsylvania nonprofit corporation, its bylaws, and its Internal Revenue Service approval letter recognizing POCS as a tax-exempt organization. (POCS Preliminary Objections at 22; Attachment 1; Exhibits A-C.) Accordingly, we conclude that POCS has properly offered supporting documentation in support of its jurisdictional objection, and that we have sufficient grounds upon which to assess whether POCS may be deemed to be an agency of the Commonwealth, such that jurisdiction over PIOGA's action will lie in this Court under 42 Pa.C.S. §761(a)(1).

### B. The Parties' Arguments

Both parties acknowledge that POCS is facially a nonprofit corporation, and that neither the UULPL nor any other statute claims POCS as an agency of this Commonwealth. (Preliminary Objections ¶17; Answer to Preliminary Objections at ¶8). Both parties also acknowledge that the absence of a statutory provision

6

designating POCS as an agency is not necessarily dispositive, and that courts have considered a number of factors in determining whether a putatively private entity may be deemed to be a part of the Commonwealth government for purposes of our original jurisdiction statute. These factors include:

> (1) denomination as a government agency, instrumentality, body politic, etc.,
>
> (2) who appoints a majority of the board of directors or the membership of the governing body,
>
> (3) who receives the assets upon dissolution of the entity,
>
> (4) the source of the operating funds,
>
> (5) the degree of supervision by another [C]ommonwealth entity,
>
> (6) the geographic scope of operations,
>
> (7) entitlement to legal counsel from the Attorney General, and
>
> (8) statutory language distinguishing it from other Commonwealth entities.

*Cooper v. Pennsylvania State Athletic Conference*, 841 A.2d 638, 641 (Pa. Cmwlth. 2004) (citing G. DARLINGTON, K. MCKEON, D. SCHUCKERS, K. BROWN, & P. CAWLEY, PENNSYLVANIA APPELLATE PRACTICE §40:307 (West 2019-2020 ed.)).

POCS contends that none of the above-listed factors suggest that it may be deemed to be a Commonwealth entity. POCS observes that it is not designated as an agency or a part of the Commonwealth government in the UULPL or any other statute. (Preliminary Objections ¶17(a); POCS' Br. at 20.) With regard to its board of directors, POCS acknowledges that the UULPL requires the presence of the Chairman

7

of the Public Utility Commission (PUC), the Director of the Pennsylvania Emergency Management Agency (PEMA), and the Secretary of the Department of Transportation (PennDOT), and further specifies that 20% of its board must be composed of representatives of municipalities or municipal authorities. 73 P.S. §178.1(d). However, POCS asserts that the majority of its 35-member board consists of private entity stakeholders, who were "chosen by the facility owners" as the UULPL directs. *Id.* Because the Commonwealth does not appoint or control a majority of its board of directors, POCS argues that the second factor supports a conclusion that it is a private entity. (Preliminary Objections ¶17(b) (citing *Pennsylvania State University v. Derry Township School District*, 731 A.2d 1272, 1274-75 (Pa. 1999) (*PSU*) ("When determining whether an institution is an agency or instrumentality of the government, we must consider whether the Commonwealth has majority control of the board.")); POCS' Br. at 20.)

As for the third factor, POCS asserts that under 15 Pa.C.S. §5975(c)[6] (relating to corporations and unincorporated associations) and POCS' bylaws, upon dissolution, POCS' assets will be distributed to POCS' members, not to the Commonwealth. (Preliminary Objections ¶17(c); POCS' Br. at 20.) With regard to the fourth factor, POCS asserts that it never has received any funding from the Commonwealth, and that its operation is funded solely by the fees received from its users. (Preliminary Objections at ¶17(d); POCS' Br. at 20.) As it concerns the fifth factor, POCS argues that it is not controlled or supervised by any other entity of the Commonwealth and, although the UULPL grants authority to the PUC to enforce the

---

[6] Section 5975(c) states that, except as otherwise provided, upon dissolution of a nonprofit corporation, "any surplus remaining after paying or providing for all liabilities of the corporation shall be distributed to the shareholders, if any, pro rata, or if there be no shareholders, among the members per capita." 15 Pa.C.S. §5975(c).

8

UULPL and to investigate violations thereof,[7] it does not allow PUC to direct or control POCS or its operations. (Preliminary Objections ¶17(e); POCS' Br. at 27.)

POCS does not address the sixth factor—geographic scope of operations—but it concedes that it operates throughout all of Pennsylvania. (Preliminary Objections ¶7 (stating that "from 1972 until 1978 POCS grew from one-call coverage of [one] county to state-wide coverage")). On the seventh factor, POCS asserts that it is not entitled to legal representation by the Attorney General, that it has never received such representation, and that it has always retained private counsel for its legal needs. (Preliminary Objections ¶17(f); POCS' Br. at 20.) For purposes of the eighth factor, POCS does not point to any statutory language distinguishing it from other Commonwealth entities.

Apart from the considerations that POCS derives from the language of the UULPL, POCS supports the majority of its factual assertions with the declaration of its President and CEO, Mr. Kiger. Beyond the specific factors listed above, Mr. Kiger's declaration offers a litany of other details about POCS' operation that purport to show that POCS is a private, rather than governmental entity: that POCS' employees are not hired or paid by the Commonwealth and do not participate in state pension plans; that POCS procured its own office space and owns the property on which its headquarters are located; that POCS does its own procurements without resort to the Commonwealth Procurement Code;[8] that POCS is not subject to the Right-to-Know Law (RTKL);[9] that

---

[7] *See, e.g.*, Section 7.10(a) of the UULPL, added by the Act of October 30, 2017, P.L. 806, 73 P.S. §182.10(a) (granting the PUC authority to order compliance with the UULPL, issue warnings, and levy administrative penalties for violations).

[8] 62 Pa.C.S. §§101-2311.

[9] Act of February 14, 2008, P.L. 14, No. 3, 65 P.S. §§67.101-67.3104.

9

POCS is not subject to the Sunshine Act;[10] and that POCS holds all funds generated by its fees in its own name and has no involvement with public funds. (Preliminary Objections ¶17(g); Attachment 1 ¶¶8-18.)

PIOGA does not dispute the factual assertions about POCS' operations set forth in Mr. Kiger's declaration. PIOGA further concedes that "the relationship between POCS and UULPL does not fit nicely into the existing jurisprudence concerning this [C]ourt's original jurisdiction." (PIOGA's Br. at 17.) In support of its view that POCS should be deemed to be a Commonwealth agency, PIOGA emphasizes the duties that the UULPL places upon POCS, which PIOGA believes to signify the General Assembly's intent to control various aspects of POCS' operations. (Answer to Preliminary Objections ¶11; PIOGA's Br. at 14-15.) In PIOGA's view, these statutorily imposed duties, particularly those related to POCS' fees and finances, have transformed POCS from a private entity into an agency of the Commonwealth.

With regard to the above-listed factors articulated in *Cooper*, PIOGA primarily emphasizes POCS' statewide operation, and points to a statement of our Supreme Court in *James J. Gory Mechanical Contracting, Inc. v. Philadelphia Housing Authority*, 855 A.2d 669, 678 (Pa. 2004) (*Gory*), that "the pivotal factors to be looked at are whether the entity operates on a statewide basis and is predominantly controlled by the state." (Answer to Preliminary Objections ¶5; PIOGA's Br. at 17 n.37.) Because POCS operates across Pennsylvania, and because the UULPL imposes duties upon POCS, PIOGA argues that POCS may be deemed to be an agency of the Commonwealth. Also due to POCS' statewide operation, PIOGA contends that any county in Pennsylvania would be an appropriate venue for the instant litigation; accordingly, if we conclude that jurisdiction will not lie in this Court's original

---

[10] 65 Pa.C.S. §§701-16.

10

jurisdiction, PIOGA requests that we transfer the matter to the Court of Common Pleas of Clarion County rather than dismiss its petition. (Answer to Preliminary Objections ¶¶18-19; PIOGA's Br. at 18.)

## C. Relevant Case Law

Our analysis is largely informed by a series of decisions of our Supreme Court concerning various entities' status as part of the Commonwealth government. In *Mooney v. Board of Trustees of Temple University of Commonwealth System of Higher Education*, 292 A.2d 395 (Pa. 1972), our Supreme Court considered whether Temple University (Temple) was a "state agency" for purposes of a statute mandating such agencies' disclosure of public records. The question arose from the General Assembly's designation of Temple as a part of the Commonwealth State System of Higher Education, enabling Temple to receive additional funding from the Commonwealth. This Court sustained Temple's preliminary objections to an action brought in our original jurisdiction, concluding that Temple was not a governmental entity, and that we therefore lacked subject matter jurisdiction over the suit.

On review, the Supreme Court noted that Temple was chartered as a nonprofit corporation, and although the legislation that altered its designation referred to Temple as an "instrumentality of the Commonwealth," the Court emphasized that it also provided that Temple "shall continue as a corporation for the same purposes as, and with all rights and privileges heretofore granted to[,] Temple University." *Id.* at 398-99. The Court found this latter language significant, in that it signaled the legislature's intent "to preserve Temple's status as a non[]profit corporation chartered for educational purposes," rather than to transform Temple into a state agency. *Id.* at 399.

11

The *Mooney* Court noted that, by statute, certain members of Temple's board of trustees were to be appointed by the Governor, the President Pro Tempore of the Senate, and the Speaker of the House. Nonetheless, the "twelve Commonwealth trustees remain only a one[-]third minority of the board's total number of thirty-six trustees," and the "majority of non-public trustees clearly retains the powers to manage and control the University." *Id.* The Court further noted that the applicable statute retained the board of trustees' authority to maintain its facilities, to control the management of its instructional, administrative, and financial affairs, and to adopt bylaws for its own governance, all of which suggested that Temple was not a state agency. *Id.* Even the statutory restrictions upon Temple's use of state-provided funds were not enough to persuade the Court, which stated that the "regulatory scheme provided by the Legislature to safeguard against improper expenditures of public funds in no way intrudes upon or alters Temple's status as a non[]profit corporation chartered for educational purposes." *Id.* at 400. Accordingly, the Court concluded that Temple was not a "state agency," and it affirmed this Court's order sustaining Temple's preliminary objections for lack of subject matter jurisdiction.

Another question concerning this Court's jurisdiction arose in *T&R Painting Co. v. Philadelphia Housing Authority*, 353 A.2d 800 (Pa. 1976). There, this Court had dismissed an action brought in our original jurisdiction against the Philadelphia Housing Authority (PHA), concluding that the entity was a local agency, not an agency of the Commonwealth. The dispute centered upon statutory language stating that the PHA "shall constitute a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof . . . ." *Id.* at 801. Although this language suggested that the PHA was an agency of the Commonwealth, our Supreme Court found the statute ambiguous in light of at least eight other statutory

provisions suggesting that it was, instead, "a local agency operating within a limited area." *Id.* Concluding that PHA's statutory powers and duties related only to matters of local concern, and that there was no need for statewide resolution of claims against it, our Supreme Court held that PHA was a local agency, not a Commonwealth agency amenable to suit in this Court's original jurisdiction. *Id.* at 802.

In *Harristown Development Corp. v. Department of General Services*, 614 A.2d 1128 (Pa. 1992), our Supreme Court considered a statute subjecting nonprofit corporations that collected rent from the Commonwealth in excess of $1,500,000.00 to the terms of the Sunshine Act and the RTKL. Relying upon *Mooney*, this Court had concluded that the new statutory language did not transform such nonprofit corporations into agencies of the Commonwealth. The Supreme Court disagreed. Simply, the Court held that the subject entity "is an agency if the General Assembly says it is." *Id.* at 1131. Because the legislation at issue amended the definition of "agency" in the Sunshine Act and the RTKL to include such nonprofit corporations, the Court found it clear that the General Assembly intended to claim them as agencies for purposes of those statutes.

*PSU* concerned a county and school district's authority to levy real estate taxes upon the Milton S. Hershey Medical Center (HMC), which was owned by Pennsylvania State University (PSU). This Court had concluded that, because PSU was an instrumentality of the Commonwealth, its property was not subject to local real estate taxes. Our Supreme Court disagreed. The Court noted that the determination of whether PSU constituted an agency of the Commonwealth depended upon a variety of factors, and was complicated by "the fact that it is not merely funded by the Commonwealth, but in certain very limited respects it has governmental characteristics, while in other regards it is plainly non-governmental." *Id.* at 1274.

13

Although courts had reached differing conclusions regarding PSU's status in different contexts, the Supreme Court did not find these disparate characterizations to be problematic "because an entity's status as an agency or instrumentality varies, depending on the issue for which the determination is being made." *Id.*

Public funding alone, the Supreme Court noted, is not dispositive. *Id.* at 1274 ("The mere funding of an institution does not . . . make it an agency or instrumentality of the state.") (citing *Mooney*, 292 A.2d at 398-99). With regard to real estate taxation, our Supreme Court stated that "the pivotal factor" is "whether the institution's real property is so thoroughly under the control of the Commonwealth, that, effectively, the institution's property functions as Commonwealth property." *Id.* The Court found the answer in the composition of PSU's board of trustees. Revisiting *Mooney*, the Court explained that, "[w]hen determining whether an institution is an agency or instrumentality of the government, we must consider whether the Commonwealth has majority control of the board." *Id.* at 1274-75 (citing *Mooney*, 292 A.2d at 399). The Court found that PSU's board was "not governmental in nature." *Id.* at 1275. PSU's board consisted of 32 members, only 10 of whom were public officials. *Id.* "Thus, governmental representation on the board constitutes only a minority interest." *Id.* Given the largely private composition of PSU's board of trustees, the Court found it clear that "the authority to control and dispose of PSU property is not within the purview of the Commonwealth." *Id.* Thus, because the real property owned by PSU was not "so controlled by the Commonwealth as to fall within the latter's immunity from local real estate taxation," PSU could not be deemed an agency of the Commonwealth in this context. *Id.*

The context-sensitivity of the determination of agency status gave rise to the Supreme Court's decision in *Gory*. Although the Supreme Court had deemed PHA

14

to be a local agency in *T&R Painting Co.*, PHA in *Gory* contended that a breach of contract claim brought against it by a construction contractor belonged in this Court's original jurisdiction, rather than that of a court of common pleas. Because the Supreme Court had concluded that the Port Authority of Allegheny County was entitled to sovereign immunity in *Marshall v. Port Authority of Allegheny County*, 568 A.2d 931 (Pa. 1990), and because PHA was a similar entity, PHA contended that *Marshall* had overruled *T&R Painting Co.* and redefined PHA as a Commonwealth agency. *Gory*, 855 A.2d at 676.

Rejecting this position, the Supreme Court again noted that the classification of an entity can vary depending upon the context. *Id.* at 677 (citing *PSU*, 731 A.2d at 1274). *Marshall*, the Court noted, concerned the scope of sovereign immunity, and thus did not control the determination of PHA's status for the "completely different purpose" of this Court's subject matter jurisdiction. *Id.* With regard to this Court's original jurisdiction, the Supreme Court in *Gory* drew a contrast between characteristics of local agencies and those of Commonwealth agencies, and articulated two considerations that are particularly significant to the jurisdictional analysis. The dispute in the instant case largely derives from the parties' differing understandings of this discussion in *Gory*:

> [W]hen determining whether an entity is a Commonwealth agency for jurisdictional purposes so that cases against it must be originally heard in the Commonwealth Court, the pivotal factors to be looked at are whether the entity operates on a statewide basis and is predominantly controlled by the state. As we explained in *T&R Painting Co.*, where the entity acts throughout the state and under the state's control, it is clearly meant to be a Commonwealth agency for jurisdictional purposes so that it may be sued in the Commonwealth Court. In contrast, where the entity operates within a single county or municipality and is governed in large part by that county or municipality, the entity must be

15

> characterized as a local agency and sued in the trial courts
> because the trial courts will be more familiar with the issues
> surrounding the entity's operations and organizational make-
> up.

*Id.* at 678.

The *Gory* Court noted that the applicable statutory scheme had changed little since *T&R Painting Co.*, that housing authorities continued to "operate solely in one locality and predominantly under the control of the governing body in that locality," and that they accordingly "must continue to be considered local agencies for purposes of jurisdiction and subject to the original jurisdiction of" the court of common pleas. *Gory*, 855 A.2d at 675-76. Applying these factors to PHA specifically, the *Gory* Court found "clear that PHA is a local agency for jurisdictional purposes" because PHA's "scope of authority is limited to the territorial boundaries of Philadelphia," and because "PHA's five members are all appointed by the Mayor of Philadelphia" rather than a Commonwealth official. *Id.* at 678.

Finally, and by way of contrast to *T&R Painting Co.* and *Gory*, our Supreme Court in *Blount v. Philadelphia Parking Authority*, 965 A.2d 226 (Pa. 2009), concluded that the Philadelphia Parking Authority (PPA) was a Commonwealth agency for purposes of this Court's original jurisdiction. The dispute in *Blount* centered upon the validity of PPA's regulations concerning taxi and limousine services, under which PPA had issued citations to various taxi drivers and companies. This Court had determined that we lacked original jurisdiction over a challenge to PPA's regulations, concluding that PPA was a local agency, not a Commonwealth agency. Our Supreme Court reached the opposite conclusion.

The *Blount* Court emphasized that, by statute, parking authorities were defined as "public bod[ies] corporate and politic, exercising public powers of the

Commonwealth as agenc[ies] of the Commonwealth." *Id.* at 230 (quoting 53 Pa.C.S. §5505(a)(1) (relating to municipalities)) (bracketed material in original). This statutory language was highly similar to that at issue in *T&R Painting Co.*, which similarly designated PHA as an agency of the Commonwealth, yet was not dispositive of PHA's status. *Id.* As in *T&R Painting Co.*, moreover, the applicable statute in *Blount* also contained language suggesting that parking authorities were local entities. *Id.* at 231. Accordingly, the *Blount* Court reasoned, determining the proper classification of PPA required consideration of the General Assembly's intent. The Court conducted this inquiry by analyzing the factors that it had outlined in *Gory*, *i.e.*, "whether the PPA operates statewide and whether it is controlled by the state." *Id.* at 231-32 (citing *Gory*, 855 A.2d at 678).

Beginning with statewide operation, the *Blount* Court observed that PPA exercised regulatory authority not only over taxicabs operating within Philadelphia, but also taxicabs that travel elsewhere in Pennsylvania to or from Philadelphia. *Id.* at 232. Moreover, PPA shared responsibility for regulating taxicab operations with the PUC, and the "two agencies' spheres of operation combine and overlap to create a system of ground transportation that is essential to the welfare of the Commonwealth 'as a whole.'" *Id.* at 233 (quoting 53 Pa.C.S. §5701.1). Where *T&R Painting Co.* and *Gory* had emphasized that PHA's powers and duties were limited to matters occurring within Philadelphia, the comparatively larger geographic scope of PPA's regulatory authority in *Blount* served to distinguish PPA from PHA, and tended to suggest that PPA was not solely a local governmental entity. Further unlike PHA, the *Blount* Court explained, "PPA is controlled by the Commonwealth." *Id.* The PPA's governing board was appointed by the Governor of Pennsylvania, and it managed PPA's property and operations without any local government oversight. *Id.* Moreover, the applicable

17

statutes directed the manner in which PPA was required to utilize its budget, its Taxicab Regulatory Fund was overseen by the General Assembly and not the City of Philadelphia, and the General Assembly reserved the right to examine PPA's accounts and records at any time. *Id.* at 233-34. This significant degree of state-level control over PPA's budget and finances further suggested that PPA was a Commonwealth agency, not a local agency.

The *Blount* Court noted that PPA was "an entity unlike any other in Pennsylvania." *Id.* at 234. Its distinctiveness notwithstanding, the Court found that PPA's status as a local or Commonwealth agency could be ascertained under the *Gory* factors. Because Commonwealth officials controlled "not only its governing structure but also its funding," and because PPA was an "entity whose actions have statewide impact," the Court concluded that PPA is a Commonwealth agency, and an action against it is properly brought in the Commonwealth Court's original jurisdiction. *Id.*

### D. Analysis

The above-discussed jurisprudence reveals a variety of considerations that must be weighed in order to determine a given entity's status for purposes of our jurisdiction. These factors include those that we identified in *Cooper*, 841 A.2d at 641; *see supra* at 7, which we find to be useful guideposts for purposes of this analysis. Importantly, however, it is clear that the focus of the inquiry differs depending upon whether we seek to ascertain the identity of an undisputedly governmental body, *i.e.*, its status as an agency of the Commonwealth or rather a local governmental unit, or whether there is a threshold question of the entity's status as a governmental body in the first place. For instance, in *Mooney*, *Harristown*, and *PSU*, our Supreme Court assessed whether ostensibly nongovernmental entities nonetheless could be considered

18

governmental agencies, and considered factors such as statutory identification of the entity as an agency, whether the Commonwealth controlled a majority of the entity's governing board and the extent to which the Commonwealth exercised authority over the entity's governance, whether the entity was funded by the Commonwealth, or any other statutory indication that the General Assembly intended that the entity would operate as a governmental agency. By contrast, in *T&R Painting Co.*, *Gory*, and *Blount*, the question was whether undisputedly governmental entities were agencies of the Commonwealth or, instead, local agencies. In that context, our Supreme Court held, the "pivotal factors" in the determination are whether the entity operates on a statewide basis and whether it is predominantly controlled by the Commonwealth, or instead by a local authority. *Blount*, 965 A.2d at 231-32; *Gory*, 855 A.2d at 678.

In our view, the principal source of the instant dispute is that PIOGA identifies and primarily relies upon the considerations tailored to differentiating between state and local agencies. Its arguments are largely nonresponsive to the threshold question of whether POCS is a governmental agency in the first place. In this regard, we observe that PIOGA does not dispute the facts set forth in Mr. Kiger's declaration, as they concern the factors identified in *Cooper*. Moreover, we disagree with PIOGA's characterization of this litigation as implicating a "unique situation" that "does not fit nicely into the existing jurisprudence concerning this [C]ourt's original jurisdiction." (PIOGA's Br. at 14, 17.) Rather, we conclude that the considerations identified in *Cooper*, coupled with our Supreme Court's holdings on similar questions, provide ample guidance on the determination of POCS' status.

As noted, it is undisputed that POCS is a nonprofit corporation and that no statute defines POCS as a governmental agency. Clearly, then, this is not a situation in which the entity "is an agency if the General Assembly says it is." *Harristown*, 614

19

A.2d at 1131. Indeed, the General Assembly not only declined to claim POCS as an agency of the Commonwealth, but the definition of a "One Call System" in the UULPL expressly states that such a system "shall be incorporated and operated as a nonprofit corporation." Section 1 of the UULPL, 73 P.S. §176; *see supra* n.3. This is analogous to the *Mooney* Court's observation that, notwithstanding Temple's statutory characterization as an "instrumentality of the Commonwealth," the statute contained language preserving Temple's status "as a corporation for the same purposes as, and with all rights and privileges heretofore granted," which suggested the General Assembly's intent to "preserve Temple's status as a non[]profit corporation chartered for educational pruposes," rather than to claim Temple as an agency of the Commonwealth. *Mooney*, 292 A.2d at 398-99. Not only does the UULPL recognize POCS' status as a nonprofit corporation, but, unlike in *Mooney*, here the General Assembly made no attempt in the UULPL to define POCS as an instrumentality of the Commonwealth.[11] We conclude, thus, that this factor weighs heavily in favor of a conclusion that POCS is not a state agency.

On the second *Cooper* factor, we find that the composition of POCS' board of directors also suggests that it is a private entity. Initially, the UULPL directs that POCS' board of directors is "to be chosen by the facility owners." Section 3.1 of the UULPL, 73 P.S. §178.1(d). That is, the board's composition is largely within the discretion of private party stakeholders; its members are not appointed by Commonwealth officials. This distinguishes POCS' board of directors from bodies such as the governing board of PPA, the members of which were appointed by the

---

[11] Moreover, although the parties do not place significant emphasis upon the eighth *Cooper* factor—statutory language distinguishing the organization from other Commonwealth entities—we note that UULPL's mandate that a "One Call System" be organized as a nonprofit corporation serves to distinguish such an entity from those that are expressly designated as agencies by statute.

20

Governor, thereby suggesting the Commonwealth's control over the organization's governance. *See Blount*, 965 A.2d at 233. As POCS acknowledges, however, the UULPL requires that three Commonwealth officials sit on its board—the Chairman of PUC, the Director of PEMA, and the Secretary of PennDOT. Section 3.1 of the UULPL, 73 P.S. §178.1(d)(1)-(2), (4). However, these three officials represent a clear minority of POCS' 35-member board. *See PSU*, 731 A.2d at 1274-75 ("When determining whether an institution is an agency or instrumentality of the government, we must consider whether the Commonwealth has majority control of the board."). The UULPL's mandate that "[n]o less than twenty percent of the seats on the board shall be held by municipalities or municipal authorities," Section 3.1(d) of the UULPL, 73 P.S. §178.1(d), does not alter our analysis. Twenty percent remains far less than majority control, and, in any event, *municipal* officials are clearly not *Commonwealth* officials. Because the Commonwealth does not control a majority of POCS' board of directors or appoint its members, we find that this factor also suggests that POCS is a private entity, not a state agency.

PIOGA does not dispute POCS' observations that the Commonwealth is not entitled to any of POCS' assets should it dissolve, and that POCS' operations are funded by the fees for using its service, not by the public fisc. Moreover, it is clear that POCS is not entitled to legal representation from the Attorney General, as POCS is represented by private counsel in the very case before us. Accordingly, the third, fourth, and seventh *Cooper* factors all suggest that POCS is a not a government agency. We additionally take note of POCS' assertions of various other indicia of its private status: that its employees are not hired or paid by the Commonwealth and do not participate in state pension plans; that it procures its own supplies and owns its own office space; that it is not subject to the RTKL or the Sunshine Act; and that it holds all

21

of its funds in its own name. (Preliminary Objections ¶17(g); Attachment 1 ¶¶8-18.) We agree that these attributes additionally differentiate POCS from entities recognized to be Commonwealth agencies.

All that remains is PIOGA's reliance upon the fifth and sixth *Cooper* factors—the degree of supervision by another Commonwealth entity and the geographic scope of operations. Although PIOGA stresses our Supreme Court's statement that "the pivotal factors to be looked at are whether the entity operates on a statewide basis and is predominantly controlled by the state," *Gory*, 855 A.2d at 678, as noted above, these considerations are most pivotal in distinguishing between state and local agencies, which was the dispositive issue in *T&R Painting Co.*, *Gory*, and *Blount*. Here, the first and most significant inquiry is whether POCS is a government agency of any type.

There is no dispute that the geographic scope of POCS' operations presently includes all of Pennsylvania. However, this factor alone clearly cannot suffice. If statewide operation was all that is required to define an entity as a Commonwealth agency, then countless private entities would be surprised to find themselves reclassified as governmental bodies. As POCS pithily argues, "Starbucks or JiffyLube or State Farm Insurance could be considered to be the 'Commonwealth government' for the court's jurisdictional purposes simply because they have statewide operations." (POCS' Br. at 21.) To be clear, statewide operation is an exceptionally weighty consideration when distinguishing between state and local agencies, for the obvious reason that the extension of a given entity's regulatory authority beyond a particular locale is highly suggestive that it is not strictly a local agency. *See, e.g.*, *Blount*, 965 A.2d at 232-33. However, when deciding whether a facially private entity

22

nonetheless may be deemed to be an agency of the Commonwealth, plainly the analysis requires more than mere statewide operation.

We turn, then, to PIOGA's contentions regarding the degree of control that the Commonwealth exercises over POCS. In support of its contention that POCS is predominantly controlled by the Commonwealth, PIOGA points to certain duties that the UULPL imposes upon POCS, particularly those relating to POCS' operations and the fees that POCS charges for its services. *See* Section 3.1(e)-(f.1) of the UULPL, 73 P.S. §178.1(e)-(f.1); *supra* n.4. These statutory provisions, according to PIOGA, demonstrate the Commonwealth's "pervasive control" over POCS' "governance and finances." (PIOGA's Br. at 17-18.) We already have addressed the UULPL's requirements concerning POCS' board of directors, and contrary to PIOGA's assertions, the composition of POCS' board suggests its status as a private entity, not a Commonwealth agency. To the extent that PIOGA asserts that the UULPL's imposition of duties upon POCS renders it a Commonwealth agency, *see* Section 3 of the UULPL, 73 P.S. §178 (Duties of One Call System), we note that the UULPL also imposes corresponding duties upon facility owners. *See* Section 2 of the UULPL, 73 P.S. §177 (Duties of facility owners). Yet, PIOGA does not suggest that the facility owners which compose its membership are therefore Commonwealth agencies.

We are no more persuaded by the UULPL's fee provisions. The existence of statutory controls on an entity's fees does not transform the entity into an agency of the Commonwealth. As just one example, it is undeniable that private automobile insurance companies are not Commonwealth agencies merely because the Motor Vehicle Financial Responsibility Law[12] contains provisions relating to the manner in which they may charge customers for using their services. Similarly here, the fact that

---

[12] 75 Pa.C.S. §§1701-1799.7.

the UULPL contains provisions relating to the fees charged by a One Call System does not mean that POCS may be deemed to be part of the Commonwealth government.

In sum, we find that the facts overwhelmingly support POCS' assertion that it is a private entity, and not a Commonwealth agency or otherwise a component part of the Commonwealth government. As such, this Court lacks original jurisdiction over PIOGA's action. 42 Pa.C.S. §761(a)(1).

In the event that we find subject matter jurisdiction lacking, as we have, PIOGA requests that we transfer its petition to the Court of Common Pleas of Clarion County as an alternative to dismissal. (PIOGA's Br. at 18.) POCS opposes such a transfer, although it concedes that, due to its statewide operation, venue would be proper in any county in Pennsylvania under Pa.R.C.P. No. 2179.[13] (POCS' Reply Br. at 11.) Under section 5103(a) of the Judicial Code, 42 Pa.C.S. §5103(a),[14] and

---

[13] Rule 2179 of the Pennsylvania Rules of Civil Procedure provides that an action against a corporation or similar entity may be brought in "a county where it regularly does business." Pa.R.C.P. No. 2179(a)(2).

[14] Section 5103(a) provides:

> If an appeal or other matter is taken to or brought in a court or magisterial district of this Commonwealth which does not have jurisdiction of the appeal or other matter, the court or magisterial district judge shall not quash such appeal or dismiss the matter, but shall transfer the record thereof to the proper tribunal of this Commonwealth, where the appeal or other matter shall be treated as if originally filed in the transferee tribunal on the date when the appeal or other matter was first filed in a court or magisterial district of this Commonwealth. A matter which is within the exclusive jurisdiction of a court or magisterial district judge of this Commonwealth but which is commenced in any other tribunal of this Commonwealth shall be transferred by the other tribunal to the proper court or magisterial district of this Commonwealth where it shall be treated as if originally filed in the transferee court or magisterial district of this Commonwealth on the date when first filed in the other tribunal.

**(Footnote continued on next page…)**

24

Pa.R.C.P. No. 213(f),[15] we will transfer the matter to the Court of Common Pleas of Clarion County. *See Seitel*, 92 A.3d at 863-64. The Prothonotary of this Court shall transmit the record of the above proceedings to the Prothonotary of the Court of Common Pleas of Clarion County. PIOGA shall bear the costs of the transfer. Pa.R.C.P. No. 213(f); *Leonard v. Thornburgh*, 463 A.2d 77, 79 (Pa. Cmwlth. 1983).

POCS' preliminary objection is sustained.


_____
PATRICIA A. McCULLOUGH, Judge


Judge Crompton did not participate in this decision.

_____

42 Pa.C.S. §5103(a).

[15] Rule 213(f) provides:

> When an action is commenced in a court which has no jurisdiction over the subject matter of the action it shall not be dismissed if there is another court of appropriate jurisdiction within the Commonwealth in which the action could originally have been brought but the court shall transfer the action at the cost of the plaintiff to the court of appropriate jurisdiction. It shall be the duty of the prothonotary or clerk of the court in which the action is commenced to transfer the record together with a certified copy of the docket entries to the prothonotary or clerk of the court to which the action is transferred.

Pa.R.C.P. No. 213(f).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Independent Oil & Gas : 
Association, : 
              Petitioner : 
               :   No.  507 M.D. 2019
           v. : 
               : 
Pennsylvania One Call System, : 
Inc., : 
              Respondent : 

## ***ORDER***

AND NOW, this 5th day of January, 2021, the preliminary objection of Pennsylvania One Call System, Inc., is SUSTAINED.  Because this Court lacks subject matter jurisdiction over the claims asserted in Pennsylvania Independent Oil & Gas Association's petition for review, we transfer the above-captioned matter to the Court of Common Pleas of Clarion County.  The Prothonotary of this Court shall transmit the record and a certified copy of the docket entries of the above proceedings to the Prothonotary of the Court of Common Pleas of Clarion County.  Pennsylvania Independent Oil & Gas Association shall bear the costs of the transfer.

_____
PATRICIA A. McCULLOUGH, Judge